650 F.2d 641
 UNITED STATES of America, Plaintiff-Appellant,
v.
James Martin MELVIN, Bruce Latshaw, a/k/a Bruce Baker,
Jerome Mergist, Steve Lee, a/k/a Steve Johnson,
Robert Alexander Nichols, David Larkin
and Robert Vincent Blasiotti,
Defendants-Appellees.
 No. 80-5123.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 July 13, 1981.
 Gary L. Betz, U.S. Atty., Thomas E. Morris, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellant.
 Harry L. Shorstein, Jacksonville, Fla., for Melvin et al.
 Maurice Wagner, Holly Hill, Fla., for Latshaw & Nichols.
 William J. Sheppard, Jacksonville, Fla., for Mergist & Lee.
 David E. Goldman, North Miami Beach, Fla., Allan P. Clark, Jacksonville, Fla., for Larkin.
 Appeal from the United States District Court for the Middle District of Florida.
 Before VANCE, HATCHETT and ANDERSON, Circuit Judges.
 R. LANIER ANDERSON, III, Circuit Judge:
 
 
 1
 The United States appeals from the dismissal of the indictment in this marijuana importation conspiracy case. The dismissal was imposed as a sanction for the government's intrusion into the appellees' attorney-client relationship by and through a co-defendant, turned confidential informant, Charles Powell. We reverse.
 
 I. FACTS AND POSTURE OF THE CASE
 
 2
 The material facts are not seriously disputed. In early March, 1979, Charles Powell was arrested by agents of the United States Customs Service in North Carolina. He, along with the appellees, was charged with participation in an alleged conspiracy to import marijuana. He agreed to cooperate with the government in its case against the alleged co-conspirators in exchange for the government's agreement to reduce the charges against him to a misdemeanor. Powell returned to his home in Jacksonville, Florida.
 
 
 3
 In the early morning hours of March 10, 1979, Powell received a telephone call from defendant Nichols asking him to come to Gainesville, Florida, that day. Powell declined to commit himself at that time, but asked Nichols to call him back later that morning. Powell then notified the Customs agents. Nichols called back and again Powell stalled for time. Then the lead attorney for the defendants called Powell and asked him to come to Gainesville to discuss the case. The lead attorney agreed to send a plane to pick up Powell. From the outset, Powell explained that he did not have an attorney yet and that his father in Arizona was looking for one. When this tactic did not dissuade Nichols' or the attorney's requests, the agents had Powell agree to go to the meeting primarily to avert any suspicion and thereby protect Powell's informer status. The agents placed a transmitter on Powell's body ostensibly for the purpose of monitoring Powell in case he got in trouble. The agents then went to Gainesville but lost Powell after he arrived at the airport in Gainesville. They drove around for some time until they located the building Powell was in by the strength of the transmission signal and recorded the conversation.
 
 
 4
 Present at the meeting in the lead attorney's office were, in addition to the attorney, two other attorneys, Nichols, Melvin and, of course, Powell. The lead attorney recorded most of the meeting; his recording was far better than the agents' recording. The transcript of the attorney's recording reveals that Powell did most of the talking. The attorneys questioned Powell about his knowledge of the case, and some trial strategy was discussed, most notably the possibility of an entrapment defense to the charges. The meeting ended with the lead attorney and others encouraging Powell to "stick with us;" the lead attorney offered to represent Powell. Powell declined the offer at that time and reemphasized that his father was trying to locate an attorney.
 
 
 5
 Following the March 10 meeting, Powell had several other meetings with the lead attorney. During a meeting on the day of the arraignment, the lead attorney introduced Powell to another attorney who represented co-defendants Mergist and Lee. That attorney told Powell that the government's main witness, Jack Brennan, could be impeached because of prior arrests and criminal activities. Powell finally agreed to let the lead attorney represent him. This lasted only for a brief period of time, from March 23 to April 4.
 
 
 6
 Customs agents had advised Powell after the arraignment not to have any more conversations with the lead attorney. But in spite of their warnings, he continued to have meetings and the agents continued to debrief him concerning the meetings. Whatever information Powell learned during the meetings was conveyed to the Assistant United States Attorney in charge of the case.
 
 
 7
 When the appellees and their attorneys learned that Powell was a confidential informer, they moved to dismiss the indictment on the ground that the government had infringed upon their Sixth Amendment right to counsel. An evidentiary hearing was held before the United States Magistrate. He found that the government had intentionally intruded into the attorney-client relationship and had gained information as a result of the intrusion. The magistrate made no explicit finding that the appellees had been prejudiced by the intrusion, but instead applied a per se rule that dismissal is required whenever there is an intrusion into the attorney-client relationship and information is passed on to the government. The magistrate also did not adequately address the issue of whether there was a Sixth Amendment violation at all. The district court made a de novo review of the transcript of the hearing before the magistrate, but essentially adopted the magistrate's findings and conclusions and this appeal follows.
 
 II. DISCUSSION
 
 8
 This case involves two issues: (1) Assuming there was a Sixth Amendment violation in this case, did the district court err in applying a per se rule to dismiss the indictment without regard to any showing of prejudice to the ability of appellee's counsel to provide adequate legal representation, and (2) Was there a Sixth Amendment violation in this case?
 
 
 9
 A. Whether the district court erred in applying a per se rule to dismiss the indictment.
 
 
 10
 With respect to this issue, a Supreme Court decision rendered on January 13, 1981, after oral argument in this case, is dispositive. In United States v. Morrison, -- U.S. --, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), the Supreme court decided that there is no per se rule requiring dismissal of the indictment as the sanction for the intrusion into the attorney-client relationship by government agents. In Morrison, government agents had approached the defendant to persuade her to cooperate in a related investigation. At the time, the agents knew she had been indicted and had retained counsel. The conversation occurred without her attorney and the agents even disparaged her attorney. The defendant moved to dismiss the indictment; the district court denied the motion. The Third Circuit reversed, applying a per se rule of dismissal of the indictment upon a showing of a Sixth Amendment violation without regard to whether the defendant made a showing of prejudice resulting from the violation. United States v. Morrison, 602 F.2d 529 (3d Cir.1979). The Supreme Court reversed in a unanimous decision. The Court reviewed its prior Sixth Amendment cases and found that none of those cases required dismissal as the remedy for a Sixth Amendment violation. Rather, the Court stated:
 
 
 11
 Our approach has thus been to identify and then neutralize the taint by tailoring suitable relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.
 
 
 12
 More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate even though the violation may have been deliberate. This has been the result reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment. The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.
 
 
 13
 -- U.S. at --, 101 S.Ct. at 668, 66 L.Ed.2d at 568-69 (footnotes omitted).
 
 
 14
 Shortly before the Supreme Court's Morrison decision, this court had reached a similar result. In United States v. Sander, 615 F.2d 215 (5th Cir.1980), cert. denied, -- U.S. --, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980), the defendant complained that his Sixth Amendment right to counsel had been violated by El Paso, Texas, police officers who examined his attorney's confidential files following the attorney's murder. The evidence showed that no information which the officers may have discovered was communicated to the government. Defendant argued that the indictment should have been dismissed. We held:
 
 
 15
 Where there is an intrusion on the attorney-client relationship the remedy for such a violation is not dismissal but the suppression of any evidence so obtained. United States v. Kilrain, 566 F.2d 979, 982 (5th Cir.1978), cert. denied, 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109. United States v. Franklin, 598 F.2d 954, 957 (5th Cir.1979). Appellant Sander made no showing of injury or prejudice because of the fact that his file at his attorney's office was viewed by the El Paso police and the Court below properly denied his motion to dismiss.
 
 
 16
 615 F.2d at 219.
 
 
 17
 Therefore, the district court erred in dismissing the indictment without first finding that the intrusion into appellees' attorney-client relationship prejudiced the ability of their attorneys to provide adequate representation or otherwise prejudiced their defense. The matter must be remanded for further findings of fact on the question of prejudice. In addition, should the district court find that the appellees have been prejudiced, it must also determine whether some remedy short of dismissal, e. g., suppression can be tailored to vindicate the appellees' Sixth Amendment rights to counsel and a fair trial and, at the same time, protect the public's interest in seeing that the guilty are brought to justice.
 
 
 18
 B. Was there a Sixth Amendment Violation?
 
 
 19
 Thus far, we have assumed that the Sixth Amendment was violated in the circumstances of this case. However, the government argued below and argues on appeal that there has been no Sixth Amendment violation at all. The argument is that the Sixth Amendment does not protect disclosures which cannot reasonably be expected to remain confidential. Because Powell had not joined the defense team, the government argues that there was no reasonable expectation of a confidential relationship between Powell and the other defendants and their attorneys, and that the Sixth Amendment therefore does not protect the instant disclosures. In other words, whatever they revealed to Powell, they did so at their peril. The government relies upon the Second Circuit decision in United States v. Gartner, 518 F.2d 633 (2d Cir.), cert. denied, 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975), where the defendant Gartner and his attorney met with a co-defendant whom they knew was cooperating with the government. Unknown to them, however, was the fact that a government agent was concealed in the closet and recording the conversations. Gartner complained at trial of a Sixth Amendment violation. The Second Circuit held:
 
 
 20
 (W)e find no actual intrusion upon the confidential attorney-client relationship between Gartner and Bloom (the attorney) arising out of the betrayal by Diskin. Gartner and his attorney sought this meeting with Diskin and agreed that it might be held in Diskin's apartment with full knowledge that he was cooperating with the Government. By so doing, they did not rely upon any confidential relationship between the two as attorney and client but instead with their eyes open took the risk that the suspected colleague might be wired for sound or might otherwise provide for a recording in his apartment.
 
 
 21
 518 F.2d at 637-38 (footnote omitted) (citations omitted).
 
 
 22
 Our research has uncovered no decision, other than Gartner, rejecting a Sixth Amendment claim because of the absence of a confidential relationship; however, several of the intrusion cases do suggest that this type of Sixth Amendment violation occurs only where there is an intrusion into a confidential attorney-client relationship. See Weatherford v. Bursey, 429 U.S. 545, 554 n. 4, 97 S.Ct. 837, 843 n. 4, 51 L.Ed.2d 30 (1977); United States v. Kilrain, 566 F.2d 979, 983 (5th Cir.), cert. denied, 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978); United States v. Levy, 577 F.2d 200, 209 (3d Cir.1978). Appellees complain that the government's argument would reduce the Sixth Amendment to little more than a restatement of the common-law attorney-client privilege; however, it seems that the traditional sanctity of the attorney-client relationship, characterized by the confidentiality of communications between the attorney and client, is precisely what the appellees in this case have sought to vindicate as against government intrusions. The attorney-client privilege whether or not, and to what extent, it defines or limits the Sixth Amendment right to counsel in other contexts offers an appropriate framework of analysis in this case. A communication is protected by the attorney-client privilege and we hold today is protected from government intrusion under the Sixth Amendment if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential. Thus, disclosures made in the presence of third parties may not be intended or reasonably expected to remain confidential. See McCormick on Evidence, § 91 (2d ed. 1972). Appellees miss the mark when they argue that a finding that there is no Sixth Amendment violation here would jeopardize group defense strategy in multi-defendant cases. We do not hold that disclosures between and among several defendants and their counsel in such group defense contexts would lack confidentiality, and therefore lack Sixth Amendment protection. On the contrary, there is a respectable body of law from other courts to the effect that the attorney-client privilege applies to confidential communications among attorneys and their clients for purposes of a common defense. See United States v. McPartlin, 595 F.2d 1321 (7th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); Hunydee v. United States, 355 F.2d 183 (9th Cir.1965); Continental Oil Co. v. United States, 330 F.2d 347 (9th Cir.1964); In the Matter of Grand Jury Subpoena, Etc., 406 F.Supp. 381 (S.D.N.Y. 1975); see also 2 Weinstein's Evidence, P 503(b)(06) (1980). However, even in the multiparty context, the disclosures must be made in circumstances which indicate that they were made in confidence. See United States v. Friedman, 445 F.2d 1076, 1085 n. 4 (9th Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). We observe only that there is no confidentiality when disclosures are made in the presence of a person who has not joined the defense team, and with respect to whom there is no reasonable expectation of confidentiality. We hold today only that there is no governmental intrusion into the attorney-client relationship in violation of the Sixth Amendment when a confidential informant attends a meeting of other defendants and their counsel, at the request of other defendants and their attorneys, under such circumstances that the informant could not reasonably refuse to attend without jeopardizing his undercover status, and under circumstances indicating that the other defendants and their counsel knew or should have known that the informant was not part of the defense team and knew or should have known that there was no reasonable expectation of confidentiality in the presence of the informant.
 
 
 23
 In following Gartner and adopting this rule for the Fifth Circuit, we note that the rule is consistent with the previous intrusion cases in this and other circuits. In those cases where the courts found an unconstitutional intrusion into the attorney-client relationship, there has always been a confidential setting. The intrusions were either by surreptitious electronic surveillance, United States v. Orman, 417 F.Supp. 1126 (D.Colo.1976), or by paid informants who gained positions of trust in the defense camp, United States v. Valencia, 541 F.2d 618 (6th Cir.1976) (secretary for defense counsel actually government informer); United States v. Zarzour, 432 F.2d 1 (5th Cir.1970) (informant was hired by defense attorney as an investigator), or by a "sham" co-defendant who was actually represented by an attorney who was also representing another defendant or who was participating in strategy sessions with other defendants and counsel, United States v. Levy, supra (joint representations by attorney of sham defendant and co-defendant).
 
 
 24
 The appellees argue that the disclosures to Powell in this case were intended and were reasonably expected to remain confidential. They would distinguish Gartner on the ground that Gartner and his attorney knew that the co-defendant was cooperating with the government, while in this case that fact was concealed from the appellees. The facts in this case may support a conclusion that the disclosures were not reasonably expected to remain confidential. Nichols and the lead attorney for the defendants initiated the discussions with Powell. At least during the initial stages, the appellees knew that Powell was without an attorney and that he was seeking to be represented by an attorney other than those on the defense team. The March 10 meeting was hastily called very soon after the indictments were handed down. Nichols was insistent upon meeting with Powell as soon as possible; the first call came at 2:30 a. m. At the close of the March 10 meeting, the appellees and their attorneys encouraged Powell to stick with them. Some concern was also expressed that Powell retain an attorney who could "work with" the others. They even offered to furnish him an attorney at no cost. There are definite indications that the defense camp had some reservation about Powell's loyalty and were attempting to keep him in the fold. If they did question Powell's loyalty, they may not have had a reasonable expectation that whatever was said to Powell would remain confidential. The district court made no explicit findings on the question of confidentiality. Accordingly, on remand, should it be necessary to determine whether there was a Sixth Amendment violation, the court should examine the circumstances of the meetings with Powell and make findings as to whether appellees and their attorneys reasonably expected that their conversations with Powell would remain confidential. In this regard, the district court should make separate findings with respect to the time period between March 23 and April 4 during which time the court below has already found that Powell did in fact join the defense team.[1]
 
 
 25
 REVERSED AND REMANDED.
 
 
 
 [1]
 For example, if the district court should find that the confidential attorney-client relationship included Powell only during the brief time between March 23 and April 4, then it would look only to disclosures arising from intrusions during that time and the prejudice resulting therefrom