**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Dennis Ray BELL,**
**Defendant-Appellant.**

**No. 84-3344.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 21, 1985.

Rehearing and Rehearing En Banc
Denied Jan. 7, 1986.

Edward A. Mallett, Houston, Tex., for defendant-appellant.

\* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. Weir and Kuylen's arrest was the product of an undercover investigation, by the Govern-

Before FAY and JOHNSON, Circuit Judges, and HOFFMAN \*, District Judge.

PER CURIAM:

Dennis Ray Bell was convicted of conspiracy to import marijuana in violation of 21 U.S.C. §§ 952(a), 963 (1982) and conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(6), 846 (1982) after pleading guilty to these offenses. In this direct appeal, Bell complains of the trial court's failure to comply with Fed.R. Crim.P. 11(c)(1) in accepting Bell's guilty plea, the denial of Bell's motion to dismiss the indictment, the denial of various post-trial motions, and the eight year prison sentence Bell received. We disagree with Bell's allegations of error and find that the conviction and sentence should stand.

## I. FACTS

Norman Weir and Charles Kuylen were arrested on June 29, 1983 for conspiracy to import and distribute marijuana.[1] Their arrest was kept secret because they immediately became "confidential informants." As confidential informants, Weir and Kuylen agreed to cooperate with the Drug Enforcement Agency (the "DEA") and Agent Stephen Collins in the investigation of Bell and others involved in two marijuana conspiracies.

Bell was subsequently arrested on July 8, 1983, and charged by complaint with possession with intent to distribute a quantity of marijuana.[2] Following Bell's arrest, his attorney Joel Dick met with Agent Collins on at least two separate occasions. During these meetings they discussed the charges against Bell that would be contained in the indictment, the fact that the indictment would be sealed for thirty days, and the possibility that Bell might provide the Government with information in exchange for a reduction or a dismissal of

ment, of drug smuggling activity by Weir, Kuylen, Bell and others.

2. Curiously enough, Bell was never indicted for this charge. *See infra* p. 967.

charges. Collins indicated that sealing the indictment would provide Bell with time to covertly cooperate with the Government should he decide to do so. Collins also informed Dick that Weir and Kuylen would be named as co-defendants in the indictment. Bell, Weir and Kuylen were indicted on July 13, 1983 for conspiracy to import and for conspiracy to possess and distribute marijuana. The indictment was sealed at the Government's request.

Thereafter, Bell approached Weir and Kuylen to inform them that they would be arrested in the near future.[3] Bell suggested that Weir and Kuylen join him for a meeting scheduled with his attorney, Joel Dick, to decide what course of action the three should take. This meeting took place on July 14, 1983 and was recorded in its entirety by the Government.[4] During the meeting, the three co-defendants discussed the type of information they might provide to the Government during plea negotiations. The question of whether Dick would represent Weir and Kuylen was also discussed, but remained unsettled at the conclusion of the meeting.[5]

On July 28, 1983, Bell, Weir and Kuylen met with Dick a second time to discuss the charges pending against them. This meeting was also recorded by the Government. During this meeting Dick recommended that Weir and Kuylen take a trip to Belize. The motive underlying Dick's suggestion was disputed by the parties[6] and became the focus of a separate complaint charging Dick and Bell with obstruction of justice.

References to Weir and Kuylen's retention of another attorney were also made during this meeting.

Later that morning, Bell and Dick attended the scheduled arraignment where they first learned that the indictment had been unsealed and that the indictment also named Weir and Kuylen. Thereafter, Dick and Bell were arrested and charged by complaint with obstruction of justice.

## II. DISPOSITION BELOW

Bell filed numerous pre-trial motions in this case including a motion to dismiss the indictment. A hearing on several of the motions, including the motion to dismiss, was held January 31, 1984 before G. Kendall Sharp, United States District Judge for the Middle District of Florida. These motions were denied.

On February 21, 1984, Bell entered into a written plea agreement in which he agreed to enter a conditional[7] plea of guilty to both counts in the indictment in the marijuana case. That same day, Judge Sharp presided over jury selection in the obstruction case.

One week later, on February 27, 1984, a jury trial in the obstruction case commenced before Richard B. Kellam, Senior District Judge for the Eastern District of Virginia.[8] On February 29, 1984 the jury found Bell not guilty of either obstruction count. Subsequently, Bell moved to transfer his renewed motion to dismiss and to transfer his sentencing hearing from Judge

---

3. At this time, Bell was unaware of Weir and Kuylen's earlier arrest on June 29, 1983.

4. The Government's motive for recording the conversation is disputed by the parties. The Government contends that Agent Collins' decision was based upon a concern for the safety of the informants and a concern that Weir and Kuylen might be offered some inducement not to testify against Bell or not to cooperate with the Government in its investigation. Bell argues that the Government's rationale is not credible.

5. The following day, however, Weir called Bell and indicated that he and Kuylen would probably be unable to retain Dick for financial reasons.

6. Dick and Bell contended that they suggested the trip to Belize as a means of obtaining money to assist their defense and information that might be used in plea negotiations. The Government claimed that Dick and Bell hoped Weir and Kuylen's departure would result in a dismissal of the pending charges.

7. The plea was taken with the express understanding that Bell would have the right to appeal the denial of any pre-trial orders in the case.

8. There was neither notice nor explanation of the transfer of proceedings nor was any objection taken.

Sharp to Judge Kellam. In support of this motion, Bell argued that Judge Kellam was in the best position to reconsider the motion to dismiss in that he presided at Bell's obstruction of justice trial. Judge Sharp denied the motion.

On April 4, 1984 Bell filed a motion to postpone sentencing pending receipt of transcripts in the obstruction of justice case and a motion to supplement the record in this case with the record from the obstruction of justice trial. Judge Sharp rescheduled the sentencing hearing for May 21, 1984 and granted the motion to supplement the record. A second motion to continue sentencing pending completion of the statement of facts was denied.

On May 21, 1984, Judge Sharp sentenced Bell to a period of incarceration of eight years and revoked his bond.

## III. ARGUMENTS ON APPEAL

Bell raises the following points of error at the trial court level. First, Bell claims that there was a complete failure by the trial court to address a core concern of Fed.R.Crim.P. 11 when it accepted Bell's guilty plea. Bell argues that this failure to comply with Rule 11 requires that his guilty plea be set aside and the case remanded for another hearing at which he may plead anew. Second, Bell argues that the trial court erred when it denied the motion to dismiss. Third, Bell claims that the eight year sentence was improperly imposed because, among other things, the trial court failed to comply with Fed.R. Crim.P. 32. Bell argues that the mandatory language of the rule requires that the sentence be vacated. Finally, Bell claims that the trial court erred by denying his request to transfer his motion to dismiss and his sentencing to Judge Kellam and by denying his second motion to continue sentencing. After considering Bell's third and fourth claims of error, we find that they are without merit and warrant no further discussion. We consider the remaining two issues below.

**9.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) we adopted as

## IV. DISCUSSION

### A. Rule 11.

■ In *United States v. Dayton,*[9] 604 F.2d 931, 934 (5th Cir.1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980), this court's predecessor made a "clear and definitive statement of how trial courts should conduct guilty plea hearings." *Dayton* recognized that three core concerns underlie Rule 11: (1) the guilty plea must be free from coercion; (2) the defendant must understand the nature of the charges; and (3) the defendant must know the consequences of his plea. 604 F.2d at 939. A court's failure to address any one of these three core concerns requires automatic reversal. *Id.* (citing *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)).

In this appeal, Bell claims that the district court "complete[ly]" failed to establish that he understood the nature of the charges against him. He argues that this failure requires automatic reversal and entitles him to replead. We disagree with Bell's assertion that the district court completely failed to establish Bell's understanding of the nature of the charges and find no violation of Rule 11.

■ It is well established that the nature of the inquiry required by Rule 11 will vary from case to case. *McCarthy,* 394 U.S. at 467 n. 20, 89 S.Ct. 1166, 1171 n. 20. Courts have declined to set forth a simple or mechanical rule for determining whether or not a defendant is informed of and understands the nature of the charges against him. *Dayton,* 604 F.2d at 937–938. *See also McCarthy,* 394 U.S. at 467 n. 20, 89 S.Ct. 1166, 1171 n. 20. Instead, this inquiry is committed to "the good judgment of the court, [and] to its calculation of the relative difficulty of comprehension of the charges and of the defendant's sophistication and intelligence." *Dayton,* 604 F.2d at 938 (footnote omitted).

precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

In the present case, Bell had the benefit of a written plea agreement which clearly and concisely set forth the charges.[10] The charges to which Bell pled guilty were "simple" ones. *Accord Dayton*, 604 F.2d at 942 (possession of marijuana with intent to distribute found to be a "simple charge"). Before accepting the guilty plea, the district court, at Bell's request, granted a recess to afford Bell the opportunity to read and to discuss the plea agreement with the three attorneys representing him at the hearing. Upon reconvening, after the recess, the court proceeded to inquire into Bell's educational and professional background:

> THE COURT: What is your educational background?

**10.** The plea agreement stated: "Count One of the Indictment charges conspiracy to import marihuana in violation of Title 21, United States Code, Sections 952(a) and 963.... Count Two of the Indictment charges conspiracy to possess with the intent to distribute in excess of 1,000 pounds of marihuana in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(6) and 846."

**11.** In determining the scope of the inquiry needed to apprise a defendant of the nature of the charges against him, the court is entitled to take into account the defendant's sophistication and intelligence. *Dayton*, 604 F.2d at 938 When the court relies on the defendant's sophistication and intelligence, however, it is "advisable to get it on the record by questioning him." *Id.* at n. 11. This is precisely what the district court did in the present case.

**12.** We reproduce below relevant excerpts from the transcript of the Rule 11 proceeding:

> THE COURT: Have you entered into this Plea Agreement freely and voluntarily after consulting with your attorneys?
> DEFENDANT: Yes, sir.
>     \*   \*   \*   \*   \*   \*
> THE COURT: Mr. Bell, I see that it is stated in here, but do you understand that by entering a plea of guilty to the counts in the Indictment that you could receive a maximum sentence of imprisonment up to five years and $15,000.00 on one count and the maximum possible imprisonment of fifteen years and $15,000.00 on the other count?
> DEFENDANT: Yes, sir.

**13.** Agent Collins' recitation of the facts is reproduced below in full:

> THE GOVERNMENT: Did you have occasion to instigate an investigation into the activities of Dennis Ray Bell and his activities involving

> THE DEFENDANT: I have two credits in college.

> THE COURT: What is your trade or occupation?

> THE DEFENDANT: Real estate.

Through this inquiry, we are satisfied that the district court established that Bell was a sophisticated and intelligent person who was fully able to understand the nature of the charges against him.[11] The court then moved on to inquire into the remaining two "core concern" areas of Rule 11.[12]

After this colloquy between the court, Bell, and his counsel, the Government presented a factual basis for the guilty plea by calling Agent Collins to testify.[13]

> the importation of marijuana into this county?
> AGENT COLLINS: Yes, I did, through a cooperating individual who was introduced to two members who were working along with Mr. Bell, Mr. Charles Kuylen and Mr. Norman Weir, who were seeking to smuggle approximately fifteen hundred pounds of marijuana from the country of Belize into the United States. I was introduced to the two other Co-defendants in the case, to obtain for them a pilot and aircraft to bring the marijuana into the United States.
> I did subsequently have several meetings with Weir and Kuylen and telephone conversation with Mr. Bell regarding the problems that would occur in sending a plane and pilot to Belize and bring the marijuana back to the United States. Arrangements were made for an undercover agent, DEA agent, to act as the pilot who brought a plane up here, showed two other members of the organization, Mr. Weir and Mr. Kuylen, the airplane and its capabilities. Negotiations broke down toward the end of May due to the fact that there were military exercises being conducted in the country of Belize and individuals involved thought it would not be safe to take the plane down there and bring the marijuana into the United States.
> THE GOVERNMENT: Did you have a conversation with Mr. Bell on or about May 25th regarding the importation of marijuana?
> AGENT COLLINS: Yes, I did.
> THE GOVERNMENT: During that conversation what did Mr. Bell state to you?
> AGENT COLLINS: He was very upset due to the fact that he had invested $200,000.00 in this operation and I could not give him a definite date when we could send the DEA undercover pilot and the plane to the country of Belize. They were in a hurry to get the

Thereafter, in commenting upon Agent Collins' recitation of the facts, Bell's attorney stated:

> I believe that recitation is exactly what the Government would offer as proof in this case, that it would support a conviction for conspiracy to import marijuana and a conviction for conspiracy to possess marijuana with the intent to distribute it, and we have no evidence to offer contrary to the proffered testimony by the Government.

The district court then accepted Bell's guilty plea.

marijuana here due to the fact that the season was about to end down there and there wouldn't be any left.

THE GOVERNMENT: On or about May 29th did you meet with Mr. Weir at the Orlando Airport regarding this conspiracy?

AGENT COLLINS: Yes, I did. I met with Mr. Weir. We had gone ahead and made arrangements to send the pilot and the plane to Belize. In fact, what we were going to do was when Mr. Weir showed up with the money to pay the pilot, we were going to arrest him, Mr. Bell and Mr. Kuylen. However, that was cancelled due to the fact that when I got to the airport Weir advised me that there were again military exercises being conducted that particular weekend in Belize and, therefore, we could not send the plane and the pilot.

THE GOVERNMENT: After that time did there come a time when you and other agents determined that it would not be safe to send a pilot to Belize?

AGENT COLLINS: Yes. There are only a couple DEA agents stationed in that area of Central America. If we sent the pilot and plane down there we could not recover it safely. Additionally, we would have to notify the Government of Belize, which would possibly cause some problems and jeopardize the safety of the agents down there.

THE GOVERNMENT: What decision, if any, did you make regarding the continuation of your investigation into those activities?

AGENT COLLINS: Due to the fact that all the individuals, Mr. Bell, Mr. Weir and Mr. Kuylen, had already approached us about bringing marijuana into the United States, we changed the course of the investigation in June to where we would offer them a two thousand pound load of marijuana.

THE GOVERNMENT: Did you in fact meet with Mr. Weir and Mr. Kuylen on or about June 8th regarding that transaction?

AGENT COLLINS: Yes, I did.

THE GOVERNMENT: Would you tell the Court what transpired at that meeting?

AGENT COLLINS: Basically advised them that we had two thousand pounds of marijuana for sale and that the price of the marijuana would be roughly $245.00 per pound. We were requesting that they pay us for a thousand pounds in cash, and we would go ahead and front their group the other thousand pounds of the marijuana.

Mr. Weir stated that he could not speak for himself but would have to get back to Mr. Bell, who was in charge of the operation at that particular time.

THE GOVERNMENT: During the period June 14th through June 28th, did the individuals involved, that is, Mr. Weir, Mr. Kuylen and Mr. Bell, have any difficulty in raising the amount of money that you discussed?

AGENT COLLINS: Apparently so. I was instructed when I was undercover with Weir and Kuylen that the main buyer was somewhat in an underground, quote unquote status and could not be reached. Subsequently, further investigation we did flash and give to Mr. Weir—showed him two thousand pounds of marijuana. We gave him a bale containing about forty to forty-five pounds of marijuana to take to his broker, who was Mr. Bell in this case.

THE GOVERNMENT: Did he in fact take that bale to Mr. Bell?

AGENT COLLINS: Yes, he did, took it to his residence.

THE GOVERNMENT: Was that on or about June 29th?

AGENT COLLINS: Yes, it was.

THE GOVERNMENT: And from June 29th until July 8th, did—excuse me, June 29th were Mr. Weir and Mr. Kuylen placed under arrest?

AGENT COLLINS: Yes, during the process of giving Mr. Weir the bale he discovered our surveillance. He was subsequently arrested the following day, immediately agreed to cooperate, along with Mr. Kuylen. They instructed me that they had taken the bale of marijuana to Mr. Bell's residence, where he would act as a broker and show it to the particular buyer involved in this case.

For the next week Weir made several telephone calls to Mr. Bell, which were recorded by our office. I had several meetings with Mr. Bell. I subsequently was introduced to Mr. Bell in person, at which time Bell explained to me that he had no idea where the buyer was at this particular time but once he did get back in touch with him the deal would go through.

THE GOVERNMENT: On July 28th did you have occasion to arrest Mr. Bell?

AGENT COLLINS: On July the 8th.

THE GOVERNMENT: Excuse me, July 8th.

AGENT COLLINS: Yes, executed a search warrant at the residence of Mr. Bell, retrieved and recovered the bale of marijuana and arrested Mr. Bell at that time.

In reaching our decision on the Rule 11 issue, we have given close attention to the facts of this case. As outlined above, we are presented with a situation where the charges were simple; the defendant, a sophisticated and intelligent person, was represented by three attorneys; and, finally, the defendant was given ample opportunity to discuss the charges and to read the written plea agreement during the proceeding. This case is unlike *McCarthy* where the Supreme Court was able to point out several specific, "conceivable" ways in which the defendant may have misunderstood the elements of the crime with which he was charged. *See McCarthy*, 394 U.S. at 471, 89 S.Ct. 1166, 1173; *see also, Dayton*, 604 F.2d at 936. In the present case, there is no conceivable way that Bell could have misunderstood the nature of the charges involved.

Admittedly, it would have been preferable for the district court to have read the indictment to Bell and thereafter given him the opportunity to ask questions about the indictment. *See Dayton*, 604 F.2d at 938. However, in this instance, to permit Bell to replead would be to raise form over substance. It is established that when reviewing a Rule 11 proceeding, "'[m]atters of reality, and not mere ritual, should be controlling.'" *McCarthy*, 394 U.S. at 468 n. 20, 89 S.Ct. at 1171 n. 20 (quoting *Kennedy v. United States*, 397 F.2d 16, 17 (6th Cir. 1968), *cert. denied*, 394 U.S. 1018, 89 S.Ct. 1636, 23 L.Ed.2d 43 (1969)). Consequently, based on the facts of this case, we find no violation of Rule 11.

B. Denial of the Motion to Dismiss the Indictment.

Bell also contends that the district court erred by denying his motion to dismiss. In support of this motion, Bell argues that the Government improperly interfered with the attorney-client relationship, in violation of the sixth amendment, by monitoring the meetings with his attorney, Joel Dick, and the two cooperating defendants, Weir and Kuylen. This unlawful intrusion, Bell claims, warrants dismissal of the indictment. We disagree.

It is undisputed that the standard enunciated in *United States v. Melvin*, 650 F.2d 641 (5th Cir. Unit B 1981)[14] is applicable to the present case to determine whether the Government unlawfully interfered with the attorney-client relationship of Bell and Dick. In *Melvin*, the court stated that a communication is protected by the attorney-client privilege and protected from Government intrusion by the sixth amendment if it is (1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential. *Id.* at 645. Thus the relevant inquiry is not whether Bell expected his discussion with Dick, Weir and Kuylen to remain confidential, but rather, whether his expectation was reasonable.

■ The district court made explicit findings of fact on the question of the reasonableness of Bell's expectation of confidentiality at these meetings. The relevant facts are set forth below:

The facts indicate that after Dick's initial contact with Agent Collins on behalf of his client, Dick advised Bell of the impending indictments against Bell, Weir and Kuylen. Bell, whether on his own initiative or at Dick's urging, contacted Weir and Kuylen and suggested they meet. It is unclear whether Dick sought to represent all three for their collective benefit or merely to elicit from Weir and Kuylen any useful information he could extract from them while they were not accompanied by their attorney. At their meeting on July 14, 1983, neither attorney Dick nor his client, defendant Bell, inquired about Weir and Kuylen's arrangements for representation until the conversation was more than half concluded. Bell and Dick may have desired Weir and Kuylen's assistance, or hoped that Weir and Kuylen would acquiesce to a suggestion of the advantages of a common defense based upon Mr. Dick's legal

14. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982) we adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

experience and reputation; however, no inquiry was made to determine if Weir and Kuylen would also retain Mr. Dick as their counsel until much of the conversation about unrelated tangential criminal matters had been discussed among the four of them.

*Until this point, neither Dick's nor or [sic] Bell's expectation that their conversation with Weir and Kuylen would remain confidential was reasonable. Thereafter, when Weir and Kuylen did not agree to become confederates for purposes of their collective defense, but merely suggested they were looking into other representation, Dick and Bell chose to continue further discussion at their peril.*

United States v. Bell, No. 83–83–CR–ORL–18, slip op. at 6–7 (M.D.Fla. Feb. 23, 1984) (emphasis added).

The standard of review to be applied to the district court's factual findings is the "clearly erroneous" standard. *See United States v. Penn*, 721 F.2d 762, 765 (11th Cir.1983) (it is generally agreed that in criminal cases the clearly erroneous standard should be applied to factual findings on matters other than guilt). After examining the record and the facts as set forth by the district court we hold that the district court's determination that Bell's expectation of privacy was unreasonable was not clearly erroneous. It was clear from the initial meeting between Bell, Dick, Weir and Kuylen that Weir and Kuylen had not yet retained Dick.[15] Moreover, the next day, Weir indicated to Bell that he and

Kuylen would probably be unable to retain Dick for financial reasons.[16] During the second meeting with Bell and Dick, Weir and Kuylen clearly stated that they had retained another attorney to represent them. Nevertheless, Dick and Bell continued to discuss a defense strategy with Weir and Kuylen. Given these facts, we cannot say that the district court's findings were "clearly erroneous" with respect to Bell's expectations of confidentiality. As our predecessor court has held "[t]here is no confidentiality when disclosures are made in the presence of a person who has not joined the defense team, and with respect to whom there is no reasonable expectation of confidentiality." *Melvin*, 650 F.2d at 646 (emphasis deleted).[17]

■ Even assuming, for the sake of argument, that there was a violation of Bell's sixth amendment right to counsel, dismissal of the indictment would still be inappropriate absent demonstrable prejudice to the defendant. *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). Thus for example, dismissal of an indictment was inappropriate where the motion was based solely upon the egregious behavior of the agents. *Id.* at 363, 101 S.Ct. at 667. *See also Melvin*, 650 F.2d at 643 (in *Morrison* the Supreme Court held that "there is no *per se* rule requiring dismissal of the indictment as the sanction for intrusion into the attorney-client relationship by government agents"). Moreover, even where the violation is *deliberate*, dismissal of the indictment as the sanction for governmental intrusion into

15. Halfway through the initial meeting Dick inquired as to Weir and Kuylen's legal representation:
DICK: You guys want me to represent you?
WEIR: Uh, yeah, we'll talk that over and get back with you.

16. In a telephone conversation, Weir said to Bell "Ah, listen, I don't know if we can afford Joel, right, Charles and I."

17. Regarding facts substantially similar to those in this case, the court in *United States v. Melvin* held:
[T]here is no governmental intrusion into the attorney-client relationship in violation of the Sixth Amendment when a confidential infor-

mant attends a meeting of other defendants and their counsel, at the request of other defendants and their attorneys, under such circumstances that the informant could not reasonably refuse to attend without jeopardizing his undercover status, and under circumstances indicating that the other defendants and their counsel knew or should have known that the informant was not part of the defense team and knew or should have known that there was no reasonable expectation of confidentiality in the presence of the informant. 650 F.2d at 646 (emphasis deleted).

the attorney-client relationship is inappropriate, absent prejudice. *Morrison,* 449 U.S. at 365, 101 S.Ct. at 668. "Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation...." *Morrison,* 449 U.S. at 364, 101 S.Ct. at 667. The proper approach is to identify and then neutralize the taint by suppressing the evidence or by ordering a new trial if the evidence has already been wrongfully admitted. *Id.* at 365, 101 S.Ct. at 668.

The district court specifically found that Bell's case was not prejudiced by Agent Collins' actions. *United States v. Bell,* No. 83–83–CR–ORL–18, slip op. at 7–8 (M.D. Fla. Feb. 23, 1984). We hold that the district court's finding of no prejudice to Bell's case is not clearly erroneous. First, the incriminating taped evidence was obtained *after* the institution of adversary proceedings.[18] The indictment against Bell, therefore, was not based on information gathered by recording Bell's meetings with his attorney. *Id.,* slip op. at 7. Second, the Government indicated that it would not introduce the recording of the July 14, 1983 conversation in the marijuana case. *Id.* Therefore, although we do not condone Agent Collins' behavior, we conclude that because Bell suffered no adverse impact as a result of the alleged sixth amendment violation, dismissal of the indictment is an inappropriate remedy.

■ In support of the motion to dismiss, Bell also contends that the Government, through a "promise" to his attorney to seal the indictment in the marijuana case for thirty days, caused such "substantial performance" by him that the Government should be estopped from denying the existence of a binding contract to dismiss this criminal prosecution. Therefore, Bell argues, dismissal is the only remedy that vindicates his due process rights.

In making this argument Bell relies, in part, on *Santobello v. New York,* 404 U.S.

257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Bell's reliance on that case is misguided. *Santobello* held that a defendant's due process rights were violated when the prosecutor, contrary to the terms of a previously negotiated plea agreement between the defendant and the state, recommended to the judge that the maximum sentence be imposed. Integral to the Court's decision was the fact that the defendant entered his guilty plea *on condition that* the prosecutor make no recommendation as to a sentence. *Id.* at 262, 92 S.Ct. at 498. Under those circumstances, the Court held "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* Unlike the defendant in *Santobello,* Bell did not plead guilty in reliance on any promises made by the Government. The District Court established that Bell's plea was entered without reliance on any "promises or inducements," other than those contained in the written plea agreement.

Moreover, Bell's reliance on the principle of "scrupulous fairness" in plea bargain negotiations, as enunciated in *Johnson v. Mabry,* 707 F.2d 323, 330 (8th Cir.1983), *rev'd,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) is also misplaced. In reversing the Eighth Circuit's decision in *Mabry,* the Supreme Court stated "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." 467 U.S. at ——, 104 S.Ct. at 2546 (footnote omitted). In *Mabry,* the prosecutor withdrew an offer of a plea bargain *after* the defendant had communicated his acceptance of that offer but *before* the defendant had entered his guilty plea with the court. Ultimately, the defendant did plead guilty to a second offer made by the prosecutor.

**18.** *See, e.g., Morrison,* 449 U.S. at 365, 101 S.Ct. at 668 (citations omitted) (when information is improperly obtained before trial but after the institution of adversary proceedings, the remedy characteristically imposed is not dismissal of the indictment).

Finding that the defendant's due process rights had not been violated, the Supreme Court stated "[i]t is only when the consensual character of the plea is called into question that the validity of a guilty plea may be impaired." *Id.* at ——, 104 S.Ct. at 2547. *See also Spann v. Wainwright,* 742 F.2d 606 (11th Cir.1984) (a defendant's mere acceptance of a prosecutor's proposed plea bargain does not create a due process right to have the bargain specifically enforced). Insofar as Bell does not dispute the voluntary nature of his guilty plea, we conclude that the denial of the motion to dismiss was proper.

For the foregoing reasons, Bell's conviction and sentence are

AFFIRMED.