933 P.2d 66

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Sara SOTO, also known as Sarah Soto, Sara Chavez, Sara Toral and Sarah Toral, and Kathy Hughes, Defendants–Appelles.**

**Nos. 18673, 18704.**

Supreme Court of Hawai'i.

Feb. 28, 1997.

Donn Fudo, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellant State of Hawai'i.

Dana S. Ishibashi, on the briefs, Honolulu, for defendant-appellee Sara Soto.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellee Kathy Hughes.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Judge.

In these consolidated appeals, the plaintiff-appellant State of Hawai'i (the prosecution) appeals the First Circuit Court's (1) findings of fact (FOFs), conclusions of law (COLs), and order, filed on December 19, 1994, granting in part the defendant-appellee Sara Soto's motion to dismiss the grand jury in-

dictment returned against her (Order No. 1) and (2) FOFs, COLs, and order, filed on December 8, 1994, granting Soto's motion for reconsideration of the circuit court's order denying her motion to dismiss Count II of the indictment (Order No. 2). In this appeal, we are asked to answer two questions of first impression in this jurisdiction: (1) were certain allegedly confidential communications between Soto and her attorney, which Soto claims were protected by the attorney-client privilege, improperly invaded by a confidential informant who overheard them, thus entitling Soto to suppression of all testimony of and evidence obtained by the confidential informant regarding the communications; and (2) after the Hawai'i Penal Code (HPC) was amended in 1986 and 1987, is the offense of criminal solicitation to commit first degree murder, in violation of Hawai'i Revised Statutes (HRS) §§ 705–510 (1993)[1] and 705–512 (1993),[2] a felony punishable by a mandatory sentence of life imprisonment with the possibility of parole? Because we answer both questions in the negative, we (1) reverse the circuit court's Order No. 1 granting, in part, Soto's motion to dismiss, (2) modify the cir-

cuit court's Order No. 2 dismissing Count II of the indictment without prejudice, and (3) remand this case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

On October 20, 1993, an O'ahu grand jury returned a three-count indictment against Soto in Cr. No. 93–2594, charging her with promoting a dangerous drug in the first degree in violation of HRS § 712–1241(1)(b)(ii)(A) (1993) (Count I),[3] criminal solicitation of first degree murder in violation of HRS §§ 705–510, see supra note 1, and 705–512, see supra note 2 (Count II), and criminal conspiracy to commit promoting a dangerous drug in the first degree, allegedly with her codefendant, Kathy Hughes, in violation of HRS § 705–520 (1993) (Count III).[4]

The manner in which the circuit court interpreted the events giving rise to the indictment in Cr. No. 93–2594 and construed certain penal statutes is at the heart of this appeal. The relevant facts, gleaned from the

1. HRS § 705–510 (1993) provides:

**Criminal solicitation.** (1) A person is guilty of criminal solicitation if, with the intent to promote or facilitate the commission of a crime, the person commands, encourages, or requests another person to engage in conduct which would be sufficient to establish complicity in the specified conduct or result.

(2) It is immaterial under subsection (1) that the defendant fails to communicate with the person the defendant solicits if the defendant's conduct was designed to effect such communication.

2. HRS § 705–512 (1993), entitled "Grading of criminal solicitation," provides that "[c]riminal solicitation is an offense one class or grade, as the case may be, less than the offense solicited."

3. HRS § 712–1241 (1993) provides in relevant part:

**Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

....

(b) Distributes:

....

(ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:

(A) One-eighth ounce or more, containing ... cocaine or any of [its] respective salts, isomers, and salts of isomers[.]

....

(2) Promoting a dangerous drug in the first degree is a class A felony.

4. HRS § 705–520 (1993) provides:

**Criminal conspiracy.** A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:

(1) [The person] agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and

(2) [The person] or another person with whom [the person] conspired commits an overt act in pursuance of the conspiracy.

HRS § 705–526 (1993) provides:

**Grading of criminal conspiracy.** (1) A conspiracy to commit a class A felony is a class B felony.

(2) Except as provided in subsection (1), conspiracy to commit a crime is an offense of the same class and grade as the most serious offense which is an object of the conspiracy.

For a discussion of the elements of the criminal conspiracy statute, see State v. Merino, 81 Hawai'i 198, 213–14, 915 P.2d 672, 687–88 (1996).

transcripts of the hearings on Soto's motions, establish the following background.

During the late 1980s or early 1990s, Eric Lau, who was Hughes's biological father, began working as a confidential informant for the Honolulu Police Department (HPD). Lau's responsibility entailed gathering evidence for cases "involving organized crime and target[ing] individuals involved in gambling, narcotics, extortion or some kind of organized crime." Lau's HPD supervisor was Detective David Brown.

In 1991 or 1992, Hughes introduced Lau to Soto, who was Hughes's lover. Eventually, Soto and Hughes moved from Honolulu to Los Angeles, where they maintained intermittent contact with Lau.

Lau testified that, when he first met Soto, she informed him of certain criminal charges pending against her in Hawai'i in Cr. No. 90–0212. With respect to these charges, Soto allegedly advised Lau that there was a particular witness, Jerry Lewis, whom she was looking for somebody to "take ... fishing and never come back." Lau eventually relayed this information to Detective Brown. In response, Detective Brown instructed Lau to "further the discussions in regards to the murder-for-hire case."

The criminal charges pending against Soto in Cr. No. 90–0212, which were unrelated to the ·present appeal, arose out of charges of attempted promoting a dangerous drug in the first degree and criminal conspiracy. Reinette Cooper was appointed as defense counsel to·represent Soto in the case. Cooper filed a motion to suppress evidence on Soto's behalf, and hearings were scheduled for March 24 and 27, 1992. Detective Brown instructed Lau to attend the hearings to "find out the results" of the motion and to reestablish contact with Soto. Apparently, Detective Brown believed that, in the event Soto lost the motion to suppress in Cr. No. 90–0212, it would be imperative to ascertain Soto's subsequent efforts, if any, to locate "the witness against her and have him killed." Lau attended the hearing on Soto's motion and sat in the first row behind the defense table. At the conclusion of the hearing, the circuit court denied Soto's motion to suppress, and Lau left the courtroom with Cooper, Soto, and Hughes and followed them into the adjoining hallway.

The testimony is unclear as to precisely what transpired in the hallway. Although she could not recall the specifics of her conversation with Soto, Cooper testified that they generally "discuss[ed] what we had to do now ... that the motion was denied, ... how the trial 'would be pursued[,] ... and what the various options would have been." Cooper considered the conversation to be, "I guess, privileged," insofar as she was "not in a habit of telling the prosecutors or the police what me and my client are planning." Cooper recalled, at the time, seeing "Lau with his head being in there, you know, around [Soto] and [Hughes] and I."

For her part, Soto testified that

[Cooper] was always concerned ... that I should consider a plea bargain, ... all the time asking me that I should consider a plea bargain. I always told her no, ... I would not consider a plea bargain because I'm not guilty about it and I wanted the case to go to trial.... [W]e were discussing who we would bring more or less to the trial because we had gone to trial on it prior.

Soto emphasized that she had not been aware that Lau was a confidential informant and that she had not knowingly waived the privileged character of her conversation with Cooper. In this connection, Soto testified that she had not consented to Lau standing next to her, that Hughes had "tried to move her father [*i.e.,* Lau] away," but that Lau had "insisted on being there."

On the other hand, Lau testified that, following the conclusion of the hearing, "I was going out and they came up to me. And I believe at that time [Soto] introduced me to Cooper." Lau also testified that, although he was not certain as to the source, it was Soto who had remarked to Hughes that "we got to work hard now." [5] Other than this remark

---

5.   Later, however, in response to a question posed by the court, Lau testified that he was "positive" that it was Hughes who had made the remark.

On the other hand, Cooper testified that it was she who had probably made the remark because "[i]t sounds like something I would say, well, we

and a comment by Soto that "she'd call" him later, Lau did not recall anything else of substance that either Cooper or Soto had said.

Finally, Detective Brown testified that Lau had not provided "any information regarding what Cooper was going to do in the future in terms of her legal representation of ... Soto." In an attempt to clarify his testimony, Detective Brown stated that Lau had not recounted anything that Cooper, Soto, or Hughes had said to him, but, rather, what Lau had heard Hughes say to others.

A year and a half later, on October 20, 1993, the grand jury returned the three-count indictment—Cr. No. 93–2594—against Soto and Hughes that is at issue in this appeal. Specifically, the indictment charged as follows:

COUNT I: On or about the 23rd day of October, 1991, in the City and County of Honolulu, State of Hawaii, SARA SOTO ... did knowingly distribute one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more, containing cocaine or any of its salts, isomers, and salts of isomers, thereby committing the offense of Promoting a Dangerous Drug in the First Degree, in violation of Section 712–1241(1)(b)(ii)(A) of the Hawaii Revised Statutes.

COUNT II: On or about the 1st day of July, 1991, to and including the 26th day of March, 1992, in the City and County of Honolulu, State of Hawaii, SARA SOTO, ... with intent to promote or facilitate the commission of a crime, to wit, Murder in the First Degree, did command, encourage or request another person to engage in conduct or cause the result specified by the definition of the offense of Murder in the First Degree, Section 707–701(1)(c), which is to intentionally or knowingly cause the death of a person known by Sara Soto ... to be a witness in a criminal prosecution, or to engage in conduct which would be sufficient to establish complicity in the specified conduct or result, thereby committing the offense of Criminal Solicitation, a felony, **the penalty for which is a mandatory sentence of life imprisonment with possibility of parole**, in violation of Section[s] 705–510 and 705–512 of the Hawaii Revised Statutes.

COUNT III: On or about the 5th day of August, 1991, to and including the 12th day of December, 1991, in the City and County of Honolulu, State of Hawaii, Defendant co-conspirator SARA SOTO ... (hereinafter "Defendant Soto"), and Defendant co-conspirator KATHY HUGHES (hereinafter "Defendant Hughes"), with the intent to promote or facilitate the commission of a crime, to wit, Promoting a Dangerous Drug in the First Degree, did enter into a conspiracy in a manner defined by Hawaii Revised Statutes Section 705–520, by agreeing with one or more persons that they or one or more of them would engage in or solicit the conduct or would cause or solicit the result specified by the definition of Promoting a Dangerous Drug in the First Degree in violation of Section 712–1241 of the Hawaii Revised Statutes, and one or more of the co-conspirators would commit an overt act in pursuance of the conspiracy. It was part of said conspiracy that Defendant Soto and Defendant Hughes would knowingly distribute one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more, containing cocaine or any of its salts, isomers, and salts of isomers.

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed within the City and County of Honolulu, State of Hawaii, and elsewhere:

### OVERT ACTS

1. On or about the 5th day of August, 1991, Eric Lau spoke with Defendant Soto who related that the "supply", which was purported to be cocaine, looked good and the price would be "fifteen", which was purported to be $15,000 per kilogram.

2. On or about the 6th day of August, 1991, Eric Lau spoke with Defendant Soto and related that he had someone who

just have to work harder now, we lost the motion."

would possibly buy forty to fifty "keys", which was purported to be forty to fifty kilograms of cocaine. Defendant Soto said she would probably get a "key" for thirteen, which was purported to be $13,000 per kilogram of cocaine. Defendant Soto and Eric Lau agreed to split the profits from the sale of cocaine.

3. On or about the 23rd day of October, 1991, Defendant Soto and Defendant Hughes met with Eric Lau in the City and County of Honolulu, State of Hawaii where Defendant Soto gave a bag containing cocaine to Eric Lau, who in turn paid Defendant Soto $400.

4. At the meeting Defendant Soto indicated that she wanted to bring to Hawaii several kilograms of cocaine per week and Defendant Hughes indicated that she would bring in the cocaine.

5. On or about the 11th day of November, 1991, Eric Lau spoke with Defendant Soto who said she would be bringing something to Honolulu, Hawaii, which was purported to be cocaine, and said that Defendant Hughes would be carrying it.

6. On or about the 12th day of November, 1991, Defendant Soto and Defendant Hughes arrived at Honolulu International Airport. In Defendant Hughes' bag was discovered two pounds of cocaine.

7. On or about the 9th day of December, 1991, Eric Lau met Defendant Soto in California, and loaned her $8,000 to purchase cocaine.

8. On or about the 12th day of December, 1991, Defendant Hughes arrived in Honolulu, Hawaii, with baggage that was purported to contain cocaine.

9. On or about the 12th day of December, 1991, Defendant Hughes spoke with Eric Lau and told him that the cocaine was missing from her baggage.

Therefore, Defendant Soto and Defendant Hughes have committed the offense of Criminal Conspiracy, **a class B felony**, in violation of Sections 705-520 and 705-526 of the Hawaii Revised Statutes.

(Underscoring in original and highlighted emphases added.)

Cooper was appointed to represent Soto in Cr. No. 93-2594. However, Cooper was forced to withdraw as defense counsel once it became apparent that she would be appearing as a witness on Soto's behalf. Thereafter, through substitute counsel, Soto filed the motions that are the subject of the present appeal. Specifically, on July 14, 1994, Soto filed (1) a motion to dismiss the grand jury indictment "on the grounds of outrageous governmental conduct and prosecutorial misconduct," in which Hughes orally joined, and (2) a motion to dismiss Count II of the indictment on the ground that, pursuant to HRS § 705-512, *see supra* note 2, the indictment should have charged criminal solicitation *as a class B felony*. On August 11, 1994, the circuit court orally denied the motion to dismiss Count II, although the court expressly invited a motion for reconsideration. Accepting the invitation, on September 8, 1994, Soto filed a motion for reconsideration of the circuit court's oral ruling.

On December 19, 1994, the circuit court entered Order No. 1, partially "granting" the defendants' motion to dismiss the indictment on the basis of "outrageous governmental conduct." The circuit court concluded, *inter alia,* that "[t]he conversation between Soto and ... Cooper, which HPD informant Lau listened in on and was subsequently debriefed by Detective Brown about, fell under the attorney-client privilege, and were not subject to revelation to the police or prosecution[.]" The circuit court further concluded that "Soto's rights to [the] effective assistance of counsel under the Sixth Amendment to the United States Constitution were violated when ... Lau, acting under specific instructions from HPD, intruded into the defense camp ..., deliberately listening in on Soto's conversations with ... Cooper, thereby gaining information on the defense's legal strategy, and then reporting that information to HPD during a debriefing[.]" Accordingly, as a remedy for this purported violation, the circuit court ordered that "all information gathered by ... Lau (whether through conversations with Soto, Hughes or others; his own investigatory work, etc.)[ ] and all his prior testimony is hereby stricken and/or suppressed 'in toto' and precluded from use in this case." In short, the circuit court

ordered that "Lau is further prohibited from testifying as a witness in Cr. No. 93–2594."

On December 8, 1994, the circuit court entered Order No. 2, granting Soto's motion for reconsideration and dismissing Count II without prejudice on the basis that, as a matter of law, criminal solicitation to commit first degree murder should have been charged *as a class B felony.*

The prosecution thereafter filed timely notices of appeal from the two orders of the circuit court.

## II. *STANDARDS OF REVIEW*

■ We answer questions of constitutional law " 'by exercising our own independent constitutional judgment based on the facts of the case.' " *State v. Trainor,* 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (quoting *State v. Lee,* 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996)). Thus, we review questions of constitutional law under the "right/wrong" standard. *State v. Toyomura,* 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995). Pursuant to the right/wrong standard, a conclusion of law is not binding upon the appellate court and is freely reviewable for its correctness. *State v. Tuipuapua,* 83 Hawai'i 141, 145, 925 P.2d 311, 315 (1996); *State v. Merino,* 81 Hawai'i 198, 219, 915 P.2d 672, 693 (1996). Moreover, findings of fact are reviewed under the "clearly erroneous" standard. *Lee,* 83 Hawai'i at 273, 925 P.2d at 1097; *Tuipuapua,* 83 Hawai'i at 145, 925 P.2d at 315. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm convic-

tion, in reviewing the entire record, that a mistake has been committed. *Lee,* 83 Hawai'i at 273, 925 P.2d at 1097; *State v. Araki,* 82 Hawai'i 474, 485, 923 P.2d 891, 902 (1996).

■ " 'The interpretation of a statute is a question of law reviewable *de novo.*' " *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996)). However, "we construe penal statutes narrowly, considering them in the light of precedent, legislative history, and common sense." *State v. Gaylord,* 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995). Furthermore, "where possible, we will read a penal statute in such a manner as to preserve its constitutionality." *Id.* at 138, 890 P.2d at 1178.

## III. *DISCUSSION*

A. *The Circuit Court Erred In Concluding (1) That An Unwelcome Third Party Who Overheard A Conversation Conducted In A Public Courthouse Hallway Between An Attorney And Her Client, Both Of Whom Were Aware Of The Third Party's Immediate Presence, Invaded The Attorney Client Privilege And (2) That The Sixth Amendment To The United States Constitution Was Thereby Violated.*

The prosecution's first point of error on appeal is that the circuit court's Order No. 1 incorrectly "granted" Soto's motion to dismiss the indictment.[6] In partially "granting" the motion, the circuit court concluded that, by his conduct, Lau had invaded the privilege accorded confidential communications between attorney and client,[7] thereby violating Soto's right to the effective assistance of

---

**6.** Although the prosecution repeatedly characterizes Soto's motion as having been "granted," the fact is that Order No. 1 did not *dismiss* the indictment as requested; rather, the order (1) precluded Lau from further testifying against the defendants, (2) struck and suppressed his prior testimony, and (3) barred all evidentiary use of the "information" that he had "gathered" through his "investigatory work."

**7.** The attorney-client privilege is codified in Hawai'i Rules of Evidence (HRE) Rule 503 (1993), which provides in relevant part:

**Lawyer-client privilege.** (a) Definitions. As used in this rule:
(1) A "client" is a person ... who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services.
(2) A "representative of the client" is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client.
(3) A "lawyer" is a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.

counsel, as guaranteed by the sixth amendment to the United States Constitution.[8] Among others, the prosecution challenges the following COLs entered by the circuit court in connection with Order No. 1:

1. The discussions between Soto and her attorney, Cooper, which HPD informant Lau listened in on and was subsequently debriefed by Detective Brown about, fell under the attorney-client privilege, and were not subject to revelation to the police or prosecution;

2. Soto's rights to effective assistance of counsel under the Sixth Amendment to

> (4) A "representative of the lawyer" is one directed by the lawyer to assist in the rendition of professional legal services.
> (5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure would be in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.
> (b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the lawyer or the lawyer's representative, or (2) between the lawyer and the lawyer's representative, or (3) by the client or the client's representative or the lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.
> ....
> (d) Exceptions. There is no privilege under this rule:
> (1) Furtherance of crime or fraud. If the services of the lawyer were sought, obtained, or used to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;
> (2) Prevention of crime or fraud. As to a communication reflecting the client's intent to commit a criminal or fraudulent act that the lawyer reasonably believes is likely to result in death or substantial bodily harm, or in substantial injury to the financial interests or property of another; [or]
> ....
> (7) Lawyer's professional responsibility. As to a communication the disclosure of which is required or authorized by the Hawaii rules of professional conduct for attorneys.

The legislature added HRE 503(d)(2) and (d)(7) to the rule in 1992, effective June 12, 1992. 1992 Haw. Sess. L. Act 191, §§ 2.2 and 5 at 408, 412. Thus, as Soto correctly notes in her answering brief, they "did not exist at the time of the hearing," following which the "courthouse hallway discussion"—at issue in the present appeal—transpired.

It is undisputed that, at all times material to the present appeal, Lau was neither a "representative of the client" nor a "representative of the lawyer," for purposes of HRE 503.

The attorney-client privilege may be waived by "voluntary disclosure." HRE 511 (1993) provides in relevant part:

> **Waiver of privilege by voluntary disclosure.** A person upon whom these rules confer a privilege against disclosure waives the privilege if, while holder of the privilege, the person ... voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure is itself a privileged communication.

*See also State v. Levi*, 67 Haw. 247, 250, 686 P.2d 9, 11 (1984) (noting, in the context of the spousal privilege, *see* HRE 505 (1993), that "the presence of a third party negates any intention of confidentiality").

We note that the Federal Rules of Evidence (FRE) do not contain an attorney-client privilege as such; therefore, there is no federal counterpart to HRE 503. Rather, FRE 501 (1996), relating to "privileges" in general, provides in relevant part that "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

8. The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

> A criminal defendant's right to counsel, being 'implicit in the concept of ordered liberty,' *see Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 ... (1937), is applicable to the states through the due process clause of the fourteenth amendment. *State v. Hutch*, 75 Haw. 307, 319 n. 3, 861 P.2d 11, 18 n. 3 (1993); *[State v.] Dicks*, 57 Haw. 46, 47, 549 P.2d [727,] 729 [(1976)]; *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 ... (1963).

*Merino*, 81 Hawai'i at 219, 915 P.2d at 693. In this connection, it is well settled that "[a]rticle I, section 14 of the [Hawai'i] Constitution parallels the sixth amendment's guarantee of a defendant's right to counsel in criminal cases[.]" *Id.* at 220 n. 21, 915 P.2d at 694 n. 21 (1996) (quoting *State v. Hutch*, 75 Haw. at 321, 861 P.2d at 19 (citation and footnote omitted)).

the United States Constitution were violated when confidential informant Lau, acting under specific instructions from HPD, intruded into the defense camp by attending the March 24 and March 27, 1992 hearings on Soto's motion to suppress evidence, deliberately listening in on Soto's conversations with her attorney, Cooper, thereby gaining information on the defense's legal strategy, and then reporting that information to HPD during a debriefing;

3. By hanging close to Cooper, Soto and Hughes as they walked down the hallway discussing the effect of the denial on Soto's case and by specifically positioning himself so that he could hear discussions between Soto and her attorney, Lau intruded into the confidential attorney-client communications, thereby violating Soto's Sixth Amendment rights;

4. Lau's debriefing of the occurrences at the hearings by Brown further heightened the intrusion and the violation of Soto's Sixth Amendment rights;

5. Soto is further prejudiced by Lau's and Brown's interpretations that Soto's statement about "working harder" meant either stepping up drug sales or efforts to

have the witness killed,[9] which testimony could be used at trial against either Soto or Hughes;

6. Soto was further prejudiced as a result of the government's order that Lau intrude into her conversation with her attorney because Soto was required to call Cooper as a witness to the making of those statements which forced Cooper to withdraw as Soto's counsel, thereby depriving Soto of her retained counsel choice[.]

The prosecution submits that, because the conversation between Cooper and Soto occurred in a public hallway in the presence of a third party, *i.e.*, Lau, to whom disclosure was in no way intended to assist in facilitating Cooper's rendition of Soto's criminal defense, the attorney-client privilege did not protect the communications at issue. Thus, the prosecution argues that no sixth amendment violation could have occurred. In effect, the prosecution argues "that the [s]ixth [a]mendment does not protect disclosures which cannot reasonably be expected to remain confidential." *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir.1981). Because we agree with the *Melvin* court that the type of sixth amendment violation alleged in the

9. The prosecution urges in its opening brief that the statement implicated HRE 503(d)(1), (2), and (7), *see supra* note 7, inasmuch as *"the [circuit] court found[,] and Cooper also believed,* that the statement did refer to 'either stepping up drug sales or efforts to have the witness killed[.]' " (Emphasis added.) Insofar as HRE 503(d)(2) and (d)(7) had not yet been promulgated at the time the events material to this appeal occurred, *see supra* note 7, they cannot be applicable to the present case. In any event, because the prosecution mischaracterizes the record, we disagree with the prosecution's position as a conceptual matter. First, the circuit court did *not* find as a fact that the statement was actually intended as an expression of a criminal objective. Rather, in FOF 29 of Order No. 1, which the prosecution does not challenge on appeal, the court found that,

> [b]ased on what he had heard, Lau *believed* the statement meant that Soto would have to sell more drugs to be able to pay her attorney's fees. [Detective] Brown had two *possible interpretations* of the statement: either that Soto would have to sell more drugs to pay for her attorney's fees or that Soto would have to put greater efforts into having ... Jerry Lewis killed. Cooper testified that she did probably make that statement, but

that she only [meant] that she and Soto would have to work harder at trial preparation[.]

(Record reference omitted.) (Emphases added.) Thus, the circuit court's FOF only purports to describe Lau's and Detective Brown's subjective interpretations of the remark that Lau claimed to have heard and not what the speaker, *see supra* section I. and note 5, actually intended the statement to mean. Second, there is no support in the record for the prosecution's suggestion that Cooper in fact believed the statement in question—which "Cooper, Soto[,] and Hughes each testified that ... Cooper [had made]," *see* FOF 28 of Order No. 1— to be nefarious. On the contrary, Cooper merely testified that she was aware that "the part where we talked about having to work harder" was "being used against my client" because "he's [*i.e.*, "Lau is"] saying that meant [Soto] had to go out and ... get rid of Jerry Lewis," resulting in Cooper being compromised "because now I have to be a witness for [Soto] and I can't very well represent her." Indeed, Cooper emphasized that she "had to withdraw ... [b]ecause some of the things Lau said was bull about our conversations ... outside in the hallway." Accordingly, we do not believe that the provisions of HRE 503(d) are germane to our analysis.

present appeal "occurs only where there is an intrusion into a *confidential* attorney-client relationship," 650 F.2d at 645 (citing, *inter alia, Weatherford v. Bursey,* 429 U.S. 545, 554 n. 4, 97 S.Ct. 837, 843 n. 4, 51 L.Ed.2d 30 (1977)) (emphasis added), we likewise agree with the prosecution's position.

1. *The communications between Soto and Cooper, conducted in a public hallway of the circuit courthouse, were not protected by the attorney-client privilege because they were not "confidential."*

■■■ We begin this stage of our analysis with the observation that the attorney-client privilege protects only those communications that are "confidential." *See* Hawai'i Rules of Evidence (HRE) 503(b), *supra* at note 7. Accordingly, we expressly approve and adopt the following conceptual framework enunciated by the United States Court of Appeals for the Fifth Circuit in *Melvin:*

A communication is protected by the attorney-client privilege—and we hold today is protected from government intrusion under the [s]ixth [a]mendment[10]—if it is intended to remain confidential *and was made under such circumstances that it was reasonably expected and understood to be confidential.* Thus, disclosures made in the presence of third parties may not be intended or reasonably expected to remain confidential. *See McCormick on Evidence,* § 91 (2d ed. 1972).... We do not hold that disclosures between and among several defendants and their counsel in ... group defense contexts would lack confidentiality, and therefore lack [s]ixth [a]mendment protection. On the contrary, ... the attorney-client privilege applies to confidential communications among attorneys and their clients for purposes of a common defense. *See United States v. McPartlin,* 595 F.2d 1321 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62

L.Ed.2d 43 ... (1979); *Hunydee v. United States,* 355 F.2d 183 (9th Cir.1965); *Continental Oil Co. v. United States,* 330 F.2d 347 (9th Cir.1964); *In the Matter of Grand Jury Subpoena, Etc.,* 406 F.Supp. 381 (S.D.N.Y.1975); *see also* 2 *Weinstein's Evidence,* ¶ 503(b)[06] (1980). However, even in the multiparty context, the disclosures must be made in circumstances which indicate that they were made in confidence. *See United States v. Friedman,* 445 F.2d 1076, 1085 n. 4 (9th Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 ... (1971). We observe only that there is no confidentiality when disclosures are made in the presence of a person who has not joined the defense team, and with respect to whom there is no reasonable expectation of confidentiality. We hold today only that there is no governmental intrusion into the attorney-client relationship in violation of the [s]ixth [a]mendment when a confidential informant attends a meeting of ... defendants and their counsel ... under circumstances indicating that the ... defendants and their counsel knew or should have known that the informant was not part of the defense team and knew or should have known that there was no reasonable expectation of confidentiality in the presence of the informant.

650 F.2d at 645–46 (some emphasis added and some deleted). *See also United States v. Landof,* 591 F.2d 36, 39 (9th Cir.1978) (although "mere presence of a third party at an attorney-client meeting does not necessarily destroy the privilege," presence of third person not "acting as an attorney or an agent at the meeting" does), *reh'g and reh'g en banc denied,* (9th Cir.1979); 8 J. Wigmore, *Evidence* § 2311 at 601–02 (McNaughton rev. ed. 1961) (presence of third party not the agent of attorney or client divests communication between them of its privileged confidentiality).

---

10. As "'the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution,'" *Arceo,* 84 Hawai'i at 28, 928 P.2d at 870 (quoting *State v. Wallace,* 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996)), we adopt the *Melvin* holding in this respect on independent state law grounds, pursu-

ant to article I, section 14 of the Hawai'i Constitution. *See supra* note 8. The parameters of the general rule of privilege pertaining to confidential attorney-client communications are, of course, limited by HRE 503(d). *See supra* note 7.

Thus, the key to whether a communication between attorney and client, which occurs in the presence of a third party, is protected by the lawyer-client privilege as set forth in HRE 503(b), *see supra* note 7, or whether the privilege has been waived by virtue of "voluntary disclosure" within the meaning of HRE 511, *see id.*, turns on the third party's status as a "representative of the client," *see* HRE 503(a)(2), *supra* at note 7, or a "representative of the lawyer," *see* HRE 503(a)(4), *supra* at note 7, on the one hand, or a person not otherwise enumerated in HRE 503, on the other. This is precisely because "disclosures made in the presence of third parties" cannot be "reasonably expected to remain confidential" when "defendants and their counsel knew or should have known that the [third party] was not part of the defense team and [therefore] knew or should have known that there was no reasonable expectation of confidentiality in the presence of the [third party]." *Melvin*, 650 F.2d at 646.

■ Neither Soto nor Hughes attempts to argue on appeal that, at any time material to the present appeal, Lau was either a "representative of the client" or a "representative of the lawyer" within the meaning of HRE 503(a)(2) or (a)(4), *see supra* note 7, thereby transforming him into a "part of the defense team." [11] The only argument advanced in Soto's appellate brief that even vaguely suggests that Lau's presence during the "courthouse hallway discussion" did not waive the protections of the attorney-client privilege was that

> Lau had ingratiated himself upon [Soto] and even testified that he came to the hearings "as a friend" and "wanted to help." ... [W]hen he held himself out as wanting to help [Soto], Lau's "help," whatever it may have been, was at least to advance the "purpose in furtherance of the

attorney-client relationship." After all, what other help could someone use at a hearing on a Motion to Suppress Evidence[?]

(Record references omitted.) This argument merely begs the question whether Soto, Hughes, and Cooper knew or should have known that Lau was not a part of the "defense team," for purposes of HRE 503.

In fact, the record establishes that Soto, Hughes, and Cooper unequivocally regarded Lau's intrusions as unwelcome and, therefore, could not have believed that he was part of the "defense team." Soto testified that, "When I [first] seen [Lau], I was already taking the stand.... I was upset because I seen him come in." Furthermore, Soto testified that, when Lau's presence was first observed in the courthouse hallway, she and Cooper "didn't really want to get into [a discussion regarding the upcoming trial] because [she] didn't appreciate ... [Lau] being there." Hughes testified that she had been "surprised" and "[u]pset" that Lau was present and that, indeed, she and Lau had argued over that fact. Hughes emphatically denied that Lau had injected himself into the "courthouse hallway discussion" as a friend seeking to assist the defense, insisting that "[h]e wasn't [there] for that. I don't know why he was [there]." Hughes explained that, during the discussion in the courthouse hallway, she had positioned herself "[b]etween [Soto] and [Lau]" and had even attempted to "grab [Lau] by the hand to remove him," so that she could "walk ... away" with him.[12] Finally, Cooper dismissed, out of hand, the possibility that she had invited Lau to participate in the discussion, testifying that,

> [i]n fact, ... somewhere in there I was questioning [Hughes] about what [Lau] was doing ... because that was, you know, weird that [Hughes's] father would be

---

**11.** In this connection, the prosecution challenges, as clearly erroneous, the circuit court's factual finding (FOF 22 of Order No. 1), which was apparently based exclusively on Lau's testimony, that "[t]he reason that Lau was permitted to approach so near to Cooper, Soto and Hughes, and thereby made privy to their discussions[,] was because he was Hughes' father and had held himself out as wanting to help[.]" We need not determine whether FOF No. 22 was clearly erroneous because it cannot support the circuit court's legal conclusion (COL 1) that the

communications at issue in this appeal "fell under the attorney-client privilege[] and were not subject to revelation to the police or prosecution[.]"

**12.** In his testimony, Lau himself acknowledged that "[Hughes] was kind of disrupted with [me] being there because ... she didn't want [me] to talk to [Soto.]" He noted that Hughes "was very displeased and asked me what I was doing [there]."

around them everytime [sic] they came to town, every hearing we had. I recall specifically feeling some concern as to what . . . Lau was doing with them.

■ The foregoing uncontroverted testimony is inherently inconsistent with the proposition that Lau was either a "representative of the client" or a "representative of the lawyer," within the meaning of HRE 503(a)(2) and (a)(4), *see supra* note 7, when Soto, Hughes, and Cooper conducted their discussion, despite Lau's unwelcome presence, in a place open and accessible to the general public—a hallway of the circuit courthouse. We therefore hold that Lau's intrusion into the "courthouse hallway discussion" occurred "under circumstances indicating that the . . . defendants and their counsel knew or should have known that [Lau] was not part of the defense team and knew or should have known that there was no reasonable expectation of confidentiality in [Lau's] presence[.]" *Melvin*, 650 F.2d at 646. That being the case, and regardless of whatever Soto, Hughes, and Cooper may have subjectively intended at the time, we further hold that the "communications" among the three, knowingly conducted in Lau's presence in the courthouse hallway, were not "confidential" within the meaning of HRE 503(a)(5) and 503(b). Accordingly, we hold that the circuit court was "wrong" in concluding that the discussion "fell under the attorney-client privilege[ ] and [was] not subject to revelation to the police or prosecution" (COL 1 of Order No. 1) and that the "communications" into which Lau intruded were "confidential" (COL 3 of Order No. 1).[13]

2. *Inasmuch as Lau was not privy to "confidential communications" during the "courthouse hallway discussion," his status as a confidential informant who later debriefed the HPD did not infringe Soto's right to the effective assistance of counsel, as guaranteed by the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution.*

■ Having held that the "courthouse hallway discussion" was not protected by the lawyer-client privilege, as statutorily codified in HRE 503, we must now determine whether Lau's "intru[sion] into the defense camp," *see* COL 2 of Order No. 1, otherwise violated Soto's right to the effective assistance of counsel, as guaranteed by the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. For the reasons discussed below, we hold that it was not.

■ We agree with the prosecution's characterization of the record in this case that

Lau's conduct[,] which enabled him to hear the statements in question . . ., was neither deceitful nor surreptitious. Both . . . Soto and Cooper [and, of course, Hughes] knew that Lau was present and [none] considered him a confidant[;] however they freely chose to speak in his, as well as others'[,] presence. Nor did [any] of them consider Lau to be a member of their defense team or necessary to the preparation of the defense strategy.

However, like the United States Supreme Court, we do not agree, as a global matter,

that whenever a defendant converses with his [or her] counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial.

*Weatherford*, 429 U.S. at 554, 97 S.Ct. at 843. Rather, we adhere to the proposition that

the [s]ixth [a]mendment [to the United States Constitution and article I, section 14 of the Hawai'i Constitution] would be violated if the government places an informant in the defense camp during a criminal [proceeding] and receives from that informant *privileged* information pertaining to the defense of the criminal charges

---

13. We do not mean to suggest by our holding that privileged "confidential communications" cannot occur in a public place. We merely hold that such communications must transpire under circumstances justifying a reasonable expectation of confidentiality. *See Melvin*, 650 F.2d at 645.

... because the ... assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his [or her] communications with his [or her] attorney are private and that his [or her] lawful preparations for trial are secure against intrusion by the government, his [or her] adversary in the criminal proceeding.

*Id.* at 554 n. 4, 97 S.Ct. at 843 n. 4 (internal quotation marks omitted) (some ellipsis points in original and some added) (emphasis added). Correlatively, we subscribe to the view of Justice Marshall that

if the government's key witnesses are permitted to discover the defense strategy by intercepting attorney-client communications, ... the witnesses are in a position to formulate in advance answers to anticipated questions, and even to shade their testimony to meet expected defenses. Furthermore, because of these dangers[,] defendants may be deterred from exercising their right to communicate candidly with their lawyers if government witnesses can intrude upon the lawyer-client relationship with impunity so long as they do not discuss what they learn with the prosecutor. And insofar as the [s]ixth [a]mendment [and article I, section 14] establish[ ] an independent right to *confidential* communications with a lawyer, that right by definition is invaded when a government agent attends meetings of the defense team at which defense plans are reviewed.

*Id.* at 564, 97 S.Ct. at 848 (Marshall, J., dissenting) (footnotes omitted) (emphasis added).

▬▬ Accordingly, we expressly approve and adopt, under article I, section 14 of the Hawai'i Constitution, the following analysis of the United States Court of Appeals for the First Circuit:

... A[s]ixth [a]mendment violation cannot be established without a showing that there is a "realistic possibility of injury" to defendants or "benefit to the State" as a result of the government's intrusion into the attorney-client relationship. *Weatherford*, 429 U.S. at 558, 97 S.Ct. at 845 ...; *United States v. Morrison*, 449 U.S. 361, 366, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 ... (1981). Because in *Weatherford*, no information was relayed and no tainted evidence offered, 429 U.S. at 558, 97 S.Ct. at 845 ..., the Court had no occasion to determine what showing of prejudice is required to make out a[s]ixth [a]mendment violation. Similarly, we have not previously had the opportunity to discuss what constitutes prejudice and who bears the burden of proving it under these circumstances.

. . . .

... Like the District of Columbia and Third Circuits, we believe that placing the entire burden on the defendant to prove both the disclosure and use of *confidential* information is unreasonable:

"It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions. Mere possession by the prosecution of otherwise *confidential* knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant. Such information is 'inherently detrimental, unfairly advantages the prosecution, and threatens to subvert the adversary system of criminal justice.'" *Briggs[ v. Goodwin]*, 698 F.2d [486,] 494–95 [ (D.C.Cir.1983) ] (quoting *Weatherford*, 429 U.S. at 556, 97 S.Ct. at 844 ... ).

Like the Ninth Circuit, however, we believe that there are certain circumstances in which the revelation of *confidential* communications by the informant is harmless. Balancing these competing concerns, we conclude that[,] in order to make a prima facie showing of prejudice[,] the defendant must prove that *confidential* communications were conveyed[14] as a result

14. For purposes of HRE 503, a confidential communication is "conveyed" if it is "disclosed to third persons other than those to whom disclosure would be in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the

of the presence of a governmental informant at a defense meeting. *Briggs,* 698 F.2d at 494–95; *[United States v.] Levy,* 577 F.2d [200,] 209 [ (3d Cir.1978) ]. Upon such proof, the burden shifts to the government to show that there has been and there will be no prejudice to the defendants as a result of these communications.

The burden on the government is high[15] because to require anything less would be to condone intrusions into a defendant's *protected* attorney-client communications. The advantage that the government gains in the first instance by insinuating itself into the midst of the defense meeting must not be abused.

*United States v. Mastroianni,* 749 F.2d 900, 907–08 (1st Cir.1984) (some ellipsis points and brackets added and some omitted) (footnote omitted) (emphases added).

Pursuant to the foregoing standards, Soto would be in a position to make a prima facie showing of a prejudicial infringement of her constitutional right to the effective assistance of counsel if the discussion at issue had transpired under circumstances justifying a reasonable expectation of confidentiality, *see supra* note 13, and Lau had been *both* a government informant *and* a codefendant, a "representative of the client" within the meaning of HRE 503(a)(2), *see supra* note 7, or a "representative of the lawyer" within the meaning of HRE 503(a)(4), *see id.,* because Lau, as a member of the "defense team," would have been privy to "confidential communications" that were protected from disclosure by HRE 503(b). *See* section III.A.1. of this opinion, *supra.* But because Lau was an unwelcome intruder, who happened to be a confidential informant, the contents of the discussion were not "confidential communications" within the meaning of HRE 503(a)(5), were not protected by the lawyer-client privilege codified in HRE 503(b), and were, therefore, "voluntarily disclosed" within the meaning of HRE 511. *See id.* and *supra* note 7. In other words, the present case does not entail the receipt of *privileged* information pertaining to the defense of criminal charges by a government plant, *see Weatherford,* 429 U.S. at 554 n. 4, 97 S.Ct. at 843 n. 4, thereby creating a "realistic possibility of injury" to Soto and Hughes or a "benefit to the State" as a result of the government's intrusion into the attorney-client relationship, *see Mastroianni,* 749 F.2d at 907.

We fail to perceive a distinction of constitutional proportions between a confidential informant who, without more, overhears a communication between an attorney and her client in a public hallway, on the one hand, and an innocent bystander who overhears the same communication, on the other. There being no violation of the sixth amendment to the United States Constitution or article I, section 14 of the Hawai'i Constitution, we hold that COLs 2, 4, and 6 of Order No. 1 were "wrong."

### 3. Summary

Because we hold that the foregoing discussions between Soto and Cooper were not protected by the attorney-client privilege, Lau's status as a confidential informant who later debriefed the HPD is insufficient—in and of itself and on the record before us—to

communication." HRE 503(a)(5), *supra* at note 7. "Disclosure" by an informant would obviously be threatened, *inter alia,* if the informant, or anyone with whom the informant shared the confidential communication, sought to testify in the defendant's criminal proceedings regarding the confidential communication or any matter derived from it, regardless of whether the informant has expressly transmitted the confidential communication to the police or prosecution in the first instance. *See* HRE 503(b), *supra* at note 7. The somewhat different federal view expressed in *Weatherford* and its progeny would seem to be a function of the lack of a counterpart to HRE 503 in the FRE. *See supra* note 7. Unlike Hawai'i law as enshrined in HRE 503, the federal construct of the attorney-client privilege derives from the ever-evolving "common law." *See id.*

15. Because the constitutional right to the assistance of counsel is implicated, an unwarranted intrusion into "protected attorney-client communications" is presumed to be prejudicial, and the prosecution's burden is to show harmlessness beyond a reasonable doubt. *See State v. Holbron,* 80 Haw. 27, 32 n. 12, 904 P.2d 912, 917 n. 12, *reconsideration denied,* 80 Haw. 187, 907 P.2d 773 (1995); *State v. Antone,* 62 Haw. 346, 349, 615 P.2d 101, 105, *reconsideration denied,* 62 Haw. 689 (1980); *State v. Okumura,* 58 Haw. 425, 431, 570 P.2d 848, 853 (1977).

establish a violation of the sixth amendment to the United States Constitution or article I, section 14 of the Hawai'i Constitution. Thus, we hold that the attorney-client privilege was not applicable to the communications in question because they were not "confidential," but, rather, were "voluntarily disclosed," *see* HRE 503(a)(5), 503(b), and 511, *supra* at note 7, insofar as they transpired (1) in the known presence of a third party (Lau), who was neither a codefendant nor a "representative" of the client or of the lawyer, *see* HRE 503(a)(2), (a)(4), and (b), *supra* at note 7, and (2) in a place accessible to the general public. Because the attorney-client privilege protecting confidential communications among Soto, Hughes, and Cooper was not violated, there cannot have been an infringement of Soto's constitutional right to the effective assistance of counsel. Accordingly, we reverse the circuit court's Order No. 1.[16]

B. *The Circuit Court Correctly Dismissed Count II Of The Indictment, Which Erroneously Characterized The Charged Offense—Criminal Solicitation To Commit First Degree Murder—As A Felony Punishable By Life Imprisonment With The Possibility Of Parole; However, The Circuit Court Erroneously Concluded That "Solicitation Of Murder In The First Degree" Is A Class B Felony.*

The prosecution's second point of error on appeal is that, in its Order No. 2, the circuit court erroneously dismissed Count II of the indictment without prejudice on the basis that, as a matter of law, criminal solicitation to commit first degree murder should have been charged as a class B felony. Foundationally to its order, the circuit court entered the following COLs, the last three of which the prosecution challenges on appeal:

1. "Criminal solicitation is an offense one class or grade, as the case may be, less than the offense solicited." [HRS §] 705-512[;]

2. The legislature intended that[ ] "[f]elonies are of three classes: class A, class B, and class C[.]" [HRS §] 701-107[;]

3. The Offense of Murder in the First or Second Degree remains classified as a class A felony[;] and

4. Solicitation of Murder in the First Degree should have an offense level equal to a class B felony. . . .

The prosecution attacks COLs 2, 3, and 4 on two alternative grounds. First, alluding to HRS 705–512, *see supra* note 2, the prosecution argues that, as amended,

the legislature delineated the felonies of murder in the first and second degrees as separate felonies . . . and provided a dramatic distinction in the respective penalties . . . , *i.e.*, life without the possibility of parole and life with the possibility of parole. . . . Thus, it appears that the legislature intended the offenses to be separate and distinct. . . .

[The fact that] the penalty for murder in the second degree [is] clearly less severe than that for murder in the first degree supports the conclusion that the penalty for solicitation to commit the former carries with it the penalty for murder in the second degree, [inasmuch] as the same is one grade lower than the offense solicited. . . .

In the alternative, the prosecution suggests that,

if one considers the offenses related to murder . . . as constituting only one general grade of felony, the penalty that would attach to the offense of solicitation to commit murder would be the 20 years' imprisonment that generally attaches to a class A felony, [inasmuch] as such felonies are one grade below the offenses relating to murder.

"Under either scenario," the prosecution urges, "one cannot argue that a proper reading of all the appropriate statutes supports the conclusion that solicitation of Murder in the First Degree should have an offense level equal to a class B felony." (Footnote and record reference omitted.) Ergo, the prose-

---

16. In light of our holding, we need not address the question whether the remedy that the circuit court fashioned for the alleged sixth amendment violation, *see supra* note 6, was erroneous.

cution concludes that COL 4 of Order No. 2 was wrong.

■ Although we agree with the prosecution that the circuit court erroneously concluded that criminal solicitation to commit first degree murder is a class B felony, we disagree that the offense is either a felony punishable by life imprisonment with the possibility of parole or a class A felony. Rather, because criminal solicitation to commit first degree murder is "a crime declared to be a felony[ ] without specification of class," within the meaning of HRS § 706–610 (1993), *see* section III.B.2 of this opinion, *infra*, we hold that it necessarily "is a class C felony" for sentencing purposes. *See id.*

In order to explain our holding, however, we must review certain relevant provisions of the Hawai'i Penal Code (HPC), HRS Title 37, both before and after their wholesale revision in 1986 and 1987, which seem to have generated considerable confusion regarding the grade or class that the legislature intended to assign to the "inchoate crimes" delineated in HRS ch. 705. In so doing, we intend that our analysis be read as a companion of our recent decision in *State v. Kaakimaka*, 84 Hawai'i 280, 933 P.2d 617 (1997), which, among other things, construed the offense level of criminal conspiracy [17] to commit second degree murder.

1. *The statutory scheme prior to the 1986 and 1987 amendments*

Prior to 1986, pursuant to [HRS] § 701–107 (1985), crimes were graded as either felonies, misdemeanors, or petty misdemeanors. Felonies were further divided into class A, B, or C. HRS § 701–107 (1985) provided in relevant part:

**Grades and classes of offense.** (1) An offense defined by [the HPC] or by any other statute of this State for which a sentence of imprisonment is authorized constitutes a crime. Crimes are of three grades: felonies, misdemeanors, and petty misdemeanors. Felonies are of

three classes: class A, class B, and class C.

(2) A crime is a felony if it is so designated in [the HPC] or if persons convicted thereof may be sentenced to imprisonment for a term which is in excess of one year.

. . . .

(Bold emphasis in original.) Under HRS § 706–610 (1985), the classification system for felonies was used to determine appropriate sentencing as well:

**Classes of felonies.** (1) Felonies defined by [the HPC] are classified, for the purpose of sentence, into three classes, as follows:

(a) Class A felonies;

(b) Class B felonies; and

(c) Class C felonies;

A felony is a class A, class B, or class C felony when it is so designated by [the HPC]. A crime declared to be a felony, without specification of class, is a class C felony.

(2) Notwithstanding any other provision of law, a felony defined by any statute of this State other than [the HPC] shall constitute for the purpose of sentence a class C felony.

(Bold emphasis in original.)

Under the previous scheme, "murder" was a singular offense defined as a class A felony:

**Murder.** (1) Except as provided in section 707–702, a person commits the offense of murder if he intentionally or knowingly causes the death of another person.

(2) Murder is a class A felony for which the defendant shall be sentenced to imprisonment as provided in section 706–606.

HRS § 707–701 (1985) (bold emphasis in original). HRS 706–606 (1985)[18] provided

---

17. *See supra* note 4.

18. HRS § 706–606 (1985) provided:
**Sentence for offense of murder**. The court shall sentence a person who has been convicted of murder to an indeterminate term of im-

prisonment. In such cases the court shall impose the maximum length of imprisonment as follows:
(a) Life imprisonment without possibility of parole in the murder of:

that murder was punishable by an indeterminate term of life imprisonment, with or without the possibility of parole, depending upon the circumstances, whereas most class A felonies were subject to "ordinary" penalties pursuant to HRS § 706–659 (1985).[19]

The related crime of attempted murder was also a class A felony. HRS § 705–502 (1985) provided that "[a]n attempt to commit a crime is an offense of the same class and grade as the most serious offense which is attempted." Like murder, attempted murder was also exempted from ordinary class A penalties. Instead, harsher penalties akin to those for murder were also available for attempted murder because, in the case of both murder and attempted murder, "the intent to kill [is] the same." *See* Commentary to HRS § 706–606.1 (1985).[20]

*Kaakimaka,* at 281–283, 933 P.2d at 620–622.

> (i) A peace officer while in the performance of his duties, or
> (ii) A person known by the defendant to be a witness in a murder prosecution, or
> (iii) A person by a hired killer, in which event both the person hired and the person responsible for hiring the killer shall be punished under this subsection, or
> (iv) A person while the defendant was imprisoned. As part of such sentence[,] the court shall order the director of the department of social services and housing and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life with parole at the end of twenty years of imprisonment.
> (b) Life imprisonment with possibility of parole in all other cases. The minimum length of imprisonment shall be determined by the Hawaii paroling authority in accordance with section 706–669.
>
> "In 1986, as part of a wholesale revision of the HPC, ... the legislature revamped HRS § 706–606 by replacing its former subject matter—sentences for the offense of murder—with universal '[f]actors to be considered in imposing a sentence.' [1986 Haw. Sess. L. Act 314,] § 15 at 599–600." *Gaylord,* 78 Hawai'i at 147, 890 P.2d at 1187 (some brackets in original and some added).

**19.** HRS § 706–659 (1985) provided:

> **Sentence of imprisonment for class A felony.** Notwithstanding sections 706–620 to 706–631, suspension of sentence and probation, and sections 706–605, 706–606, 706–606.5, 706–660.1, 706–661, 706–662, and any other law to the contrary, a person who has been convicted of a class A felony shall be sentenced to an indeter-

However, analogously to the inchoate crime of criminal conspiracy, *see supra* note 4, the offense level of which was prescribed by HRS § 705–526, *see id.,* the offense level of criminal solicitation to commit murder was prescribed by HRS § 705–512, *see supra* note 2, which established the formula for the "[g]rading of [a] criminal solicitation" as "an offense one class or grade, as the case may be, less than the offense solicited."

This reflect[ed] the position that generally solicitations, because of the reluctance of the defendant himself [or herself] to engage in the specified conduct or to cause the specified result, and the dependence of the conduct or result on the will of another, should be treated as a lower order of penal liability than commission of corresponding substantive offenses.

> minate term of imprisonment of twenty years without possibility of suspension of sentence or probation. The minimum length of imprisonment shall be determined by the Hawaii paroling authority in accordance with section 706–669.

**20.** HRS § 706–606.1 (1985) provided:

> **Sentence for offense of attempted murder.** The court shall sentence a person who has been convicted of attempted murder to an indeterminate term of imprisonment. In such cases[,] the court shall impose the maximum length of imprisonment as follows:
> (1) Life imprisonment without possibility of parole in the attempted murder of:
> (a) A peace officer while in the performance of his duties, or
> (b) A person known by the defendant to be a witness in a murder prosecution, or
> (c) A person by a hired killer, in which event both the person hired and the person responsible shall be punished under this subsection, or
> (d) A person while the defendant was imprisoned.
> As part of such sentence the court shall order the director of the department of social services and housing and the Hawaii paroling authority to prepare an application for the government to commute the sentence to life with parole at the end of twenty years of imprisonment.
> (2) Life imprisonment with possibility of parole in all other cases of attempted murder. The minimum length of imprisonment shall be determined by the Hawaii paroling authority in accordance with section 706–669.

Commentary on HRS § 705–512 (1985). Accordingly, like criminal conspiracy to commit murder, *see Kaakimaka,* at 283–284, 933 P.2d at 622–623 criminal solicitation of the class A felony of murder was a class B felony and was punishable pursuant to HRS § 706–660 (1985),[21] "which delineated the relatively lighter sentencing terms of ten years for a class B felony and five years for a class C felony." *See id.,* at 283, 933 P.2d at 622.

In sum, prior to 1986, all "crimes" described in the HPC were graded as felonies, misdemeanors, or petty misdemeanors. In turn, all felonies were organized into three classes—class A, class B, and class C—, in descending order of perceived seriousness. This structure, coupled with the fact that criminal solicitation was accorded a "lower order of penal liability" than the "corresponding substantive offense," dictated that criminal solicitation could never rise to the level of a class A felony, but, at most, could be treated as a class B felony. However, as demonstrated below, the legislature's 1986 and 1987 amendments to the HPC altered the penal classification, as prescribed by HRS § 705–512 for sentencing purposes, of criminal solicitation of murder.

2. *The statutory scheme subsequent to the 1986 and 1987 amendments to the HPC*

In 1986 and 1987, the legislature amended numerous portions of the [HPC]. *See* 1986 Haw. Sess. L. Act 314, passim; 1987 Haw. Sess. L. Act 181, passim. The relevant changes are described below.

The previous murder statute, HRS § 707–701 (1985), was amended to bifurcate the unitary offense of murder into first and second degree murder. Under the current scheme, HRS § 707–701 (1993) now governs only murder in the first de-

gree. Murder in the second degree is now codified in HRS § 707–701.5 (1993) and provides:

> **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>
> (2) <u>Murder in the second degree is a felony</u> for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

(Bold emphasis in original.) (Underscored emphasis added.) In amending the statute, the legislature graded murder in the second degree as a felony, but without any specification of class. Thus, the new offense of second degree murder is an unclassified felony. The amendments also created, in addition to the new offenses of first and second degree murder, the new offenses of attempted first and second degree murder (collectively, the new homicide offenses).

HRS § 701–107(1) (1985) was also amended to reflect all of the new homicide offenses as unclassified felonies. HRS § 701–107 (1993) provides in pertinent part:

> **Grades and classes of offenses.** (1) ... Crimes are of three grades: felonies, misdemeanors, and petty misdemeanors. <u>Felonies include murder in the first and second degrees, attempted murder in the first and second degrees, and the following three classes: class A, class B, and class C.</u>

(Bold emphasis in original.) (Underscored emphasis added.) Additionally, HRS § 706–610 (1985) was amended to exempt the new homicide offenses from classifica-

---

21. HRS § 706–660 (1985) provided:

> **Sentence of imprisonment for class B and C felonies; ordinary terms.** A person who has been convicted of a class B or class C felony may be sentenced to an indeterminate term of imprisonment except as provided for in section 706–606.1 relating to the use of firearms in certain felony offenses. When ordering such a sentence, the court shall impose the maximum length of imprisonment[,] which shall be as follows:

> (1) For a class B felony—10 years; and
> (2) For a class C felony—5 years.
> The minimum length of imprisonment shall be determined by the Hawaii paroling authority in accordance with section 706–669.

The legislature amended HRS § 706–660 in 1986 to add a further exception, "as provided for in ... [HRS § ] 706–606.5 relating to repeat offenders." 1986 Haw. Sess. L. Act 314, § 38 at 611. *See* HRS § 706–660 (1993).

tion for sentencing purposes. HRS § 706–610 (1993) provides:

**Classes of felonies.** (1) Apart from first and second degree murder and attempted first and second degree murder, felonies defined by [the HPC] are classified, for the purpose of sentence, into three classes, as follows:

(a) Class A felonies;

(b) Class B felonies; and

(c) Class C felonies.

A felony is a class A, class B, or class C felony when it is so designated by [the HPC]. Except for first and second degree murder and attempted first and second degree murder, a crime declared to be a felony, without specification of class, is a class C felony.

(Bold emphasis in original.) (Underscored emphases added.)

. . . .

Finally, new sentencing provisions were created for the new homicide offenses under HRS § 706–656 (1993), which provided in relevant part:

**Terms of imprisonment for first and second degree murder and attempted first and second degree murder.** [ (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole.]

. . . .

(2) Persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole.[ . . . ]

(Bold emphasis in original.)[22] The 1986 and 1987 legislative enactments, however did not specify any changes to the offense of criminal conspiracy, and therein lies the source of confusion . . . .

*Kaakimaka*, at 284–285, 933 P.2d at 623–624 (some ellipsis points in original and some added).

By the same token, the 1986 and 1987 legislative enactments altered neither HRS § 705–512, *see supra* note 2, which continued to peg the offense of criminal solicitation at "one class or grade, as the case may be, less than the offense solicited," nor the definition of criminal solicitation, as it had previously appeared in HRS § 705–510, *see supra* note 1. Thus, as in *Kaakimaka*, "therein lies the source of confusion" in this case.

Nevertheless, we believe that the language of HRS § 705–512 is clear and unambiguous. *Cf. Kaakimaka*, at 290–291, 933 P.2d at 627–628 ("We believe the language of HRS § 705–526 is clear and unambiguous."). Count II of the indictment in this case charged Soto with criminal solicitation of first degree murder, and first degree murder is an "unclassified felony." Accordingly, criminal solicitation of first degree murder is also an "unclassified felony." *Cf. Kaakimaka*, at 290, 933 P.2d at 627 ("[C]onspiracy to commit . . . murder is . . . an unclassified felony.").

. . . HRS § 706–610 (1993) provides that, "for the purpose of sentence[,] . . . a felony, without specification of class, is a class C felony." We acknowledge that, prior to the '86 and '87 amendments, [criminal solicitation of first degree murder] was a class B felony. Nonetheless, it is our task to . . . construe the statute strictly, *State v. Ortiz*, 74 Haw. 343, 352, 845 P.2d 547, 552 (1993) (citations omitted). . . . In the absence of any guidance regarding the legislature's intent, we are required to construe a sentencing provision in favor of the defendant. *See Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747[1753], 64 L.Ed.2d 381 (1980). "Ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* (citations omitted). "This policy of lenity

**22.** Effective June 18, 1993, the legislature added HRS § 706–657 to the HPC, which delineated certain circumstances under which the circuit court may impose an "enhanced sentence"—life imprisonment without the possibility of parole—as a consequence of a defendant's second degree murder conviction. 1993 Haw. Sess. L. Act 271,

§ 1 at 472. Accordingly, Act 271 also amended HRS § 706–656 to conform to the change. *Id.*, § 2 at 472–73. The legislature further amended HRS §§ 706–656 (1993) and 706–657 (1993) in 1996. 1996 Haw. Sess. L. Act 15, §§ 1 and 2 at 23.

means that the [c]ourt will not interpret a [state] criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended." *Simpson v. United States*, 435 U.S. 6, 15, 98 S.Ct. 909[914], 55 L.Ed.2d 70 (1978).

*Kaakimaka*, at 292, 933 P.2d at 629 (some brackets and ellipsis points in original and some added).

Therefore, we hold that, for sentencing purposes, criminal solicitation of first degree murder is a class C felony, subject to the sentencing provisions of HRS § 706–660, *see supra* note 21. *Cf. Kaakimaka*, at 292, 933 P.2d at 629 ("[W]e hold that ..., for sentencing purposes, conspiracy to commit second degree murder is a class C felony and subject to the sentencing provisions of HRS § 706–660." (Footnote omitted.)).

In sum, subsequent to the 1986 and 1987 amendments to the HPC, murder (both in the first and second degrees) was transformed into "a crime declared to be a felony[ ] without specification of class," within the meaning of HRS § 706–610. Accordingly, by virtue of HRS §§ 705–512, *see supra* note 2, and 706–610, criminal solicitation of first degree murder is also "a crime declared to be a felony[ ] without specification of class." That being the case, and in the absence of companion sentencing statutes such as HRS §§ 706–656 and 706–657, *see supra*

note 22, which expressly pertain to the new homicide offenses, it necessarily follows, and we so hold, that criminal solicitation of first degree murder "is a class C felony" for sentencing purposes. HRS § 706–610. It likewise follows, and we so hold, that the circuit court correctly dismissed Count II of the indictment against Soto, which improperly charged criminal solicitation of first degree murder as a felony punishable by life imprisonment with the possibility of parole, but erroneously concluded that "Solicitation of Murder in the First Degree should have an offense level equal to a class B felony."

## IV. CONCLUSION

For the foregoing reasons, we (1) reverse the circuit court's Order No. 1 granting, in part, Soto's motion to dismiss, (2) modify the circuit court's Order No. 2, dismissing Count II of the indictment without prejudice, to reflect our holding that the offense of criminal solicitation of first degree murder, in violation of HRS §§ 705–510 and 705–512, is a class C felony for sentencing purposes, and (3) remand this case to the circuit court for further proceedings consistent with this opinion.